| ADVERSARY PROCEEDING COVER SHEET | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) | | |
|---|---|---|---|
| **PLAINTIFF**<br>Christopher Ross | **DEFENDANT**<br>Pamela Hyde Bell | | |
| **ATTORNEYS** (Firm Name, Address, and Phone No.)<br>Dunham Hildebrand Payne Waldron, PLLC<br>9020 Overlook Blvd, Suite 316, Brentwood, TN 37027<br>(615) 933-5851 | **ATTORNEYS** (If Known)<br>Joseph P. Rusnak—Tune, Entrekin & White, P.C.<br>Capitol View, Suite 600, 500 11th Avenue North<br>Nashville, TN 37203 (615) 244-2770 | | |
| **PARTY** (Check One Box Only)<br>□ Debtor □ U.S. Trustee/Bankruptcy Admin<br>X Creditor □ Other –<br>□ Trustee | **PARTY** (Check One Box Only)<br>X Debtor □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor □ Other – Recipient/Transferee<br>□ Trustee | | |

**CAUSE OF ACTION** (WRITE BRIEF STATEMENT, INCLUDING U.S. STATUTES INVOLVED)
Plaintiff brings this cause of action for an order and judgment denying discharge pursuant to 11 U.S.C. § 727.

**NATURE OF SUIT**
(Number up to 5 boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative as 3, etc.)

| | |
|---|---|
| **FRBP 7001(1) – Recovery of Money/Property**<br>□ Recovery of money/property- §542 turnover of property<br>□ Recovery of money/property- §547 preference<br>□ Recovery of money/property- §548 fraudulent transfer<br>□ Recovery of money/property- other | **FRBP 7001(6) – Dischargeability**<br>□ Dischargeability- §523(a)(5), domestic support<br>□ Dischargeability- §523(a)(6), willful and malicious injury<br>□ Dischargeability- §523(a)(8), student loan<br>□ Dischargeability- §523(a)(15), divorce or separation obligation<br>□ Dischargeability – other |
| **FRBP 7001(2) – Validity, Priority or Extent of Lien**<br>□ Validity, priority or extent of lien or other interest in<br>    property | **FRBP 7001(7) – Injunctive Relief**<br>□ Injunctive relief – imposition of stay<br>□ Injunctive relief - other |
| **FRBP 7001(3) – Approval of Sale of Property**<br>□ Approval of sale of property of estate and co-owner - §363(h) | **FRBP 7001(8) Subordination of Claim or Interest**<br>□ Subordination of claim or interest |
| **FRBP 7001(4) – Objection/Revocation of Discharge**<br>[1] Objection / revocation of discharge - §727(c),(d),(e) | **FRBP 7001(9) Declaratory Judgment**<br>□ Declaratory judgment |
| **FRBP 7001(5) – Revocation of Confirmation**<br>□ Revocation of confirmation | **FRBP 7001(10) Determination of Removed Action**<br>□ Determination of removed claim or cause |
| **FRBP 7001(6) – Dischargeability**<br>□ Dischargeability- §523(a)(1),(14),(14A) priority tax<br>□ Dischargeability- §523(a)(2), false pretenses, false<br>    representation, actual fraud<br>□ Dischargeability- §523(a)(4), fraud as fiduciary,<br>    embezzlement, larceny | **Other**<br>□ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*<br>□ Other, *e.g.* actions that would have been in state court if unrelated to<br>    bankruptcy case |
| □ Check if case involves a substantive issue of state law | □ Check if asserted to be a class action under FRCP 23 |
| □ Check if a jury trial is demanded in complaint | Demand $ |

**BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES**

| NAME OF DEBTOR<br>Pamela Hyde Bell | BANKRUPTCY CASE NO.<br>3:25-bk-03593 | |
|---|---|---|
| DISTRICT IN WHICH CASE IS PENDING<br>Middle District of Tennessee | DIVISION OFFICE<br>Nashville | NAME OF JUDGE<br>Randal S. Mashburn |

**RELATED ADVERSARY PROCEEDING (IF ANY)**

| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
|---|---|---|
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| DATE<br>May 7, 2026 | ATTORNEY (OR PLAINTIFF) NAME AND SIGNATURE<br>Henry E. ("Ned") Hildebrand, IV:<br>*/s/ Henry E. ("Ned") Hildebrand, IV* | |

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

| | | | |
|---|---|---|---|
| IN RE: | ) | | |
| | ) | CHAPTER: | 7 |
| PAMELA HYDE BELL | ) | CASE NO.: | 3:25-bk-03593 |
| | ) | JUDGE: | Randal S. Mashburn |
| Debtor. | ) | | |
| | ) | | |
| CHRISTOPHER ROSS, | ) | ADV. PROC. | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | | |
| | ) | | |
| PAMELA HYDE BELL | ) | | |
| | ) | | |
| Defendant. | ) | | |

## COMPLAINT TO DENY DISCHARGE PURSUANT TO 11 U.S.C. § 727

Plaintiff Christopher Ross ("Mr. Ross") brings this action as a creditor of Debtor Pamela

Hyde Bell (the "Debtor"). Mr. Ross—a creditor having suffered serious bodily injury for which

the Debtor is liable—seeks entry of an order denying the Debtor a discharge under 11 U.S.C. §

727, along with related relief.

## **INTRODUCTION**

This case is simple and straightforward. The Debtor is liable for the severe personal injuries

suffered by Mr. Ross in a tragic accident. To avoid the consequences of this liability, she now

claims that her only meaningful asset—real estate capable of paying a substantial dividend to

creditors—is excluded from creditor recovery due to an alleged trust that she refuses or is

otherwise unable to explain. This is not acceptable, and it is the exact sort of conduct that 11 U.S.C.

§ 727 was designed to remedy.

The basis for Mr. Ross's requested relief in this case is two-fold. **First**, the Debtor failed to preserve recorded information from which her financial condition or business transactions might be ascertained—namely with respect to a trust and its alleged ownership of valuable real estate—in violation of 11 U.S.C. § 727(a)(3). **Second**, the Debtor made knowingly and fraudulently false oaths in her Voluntary Petition and associated statements and schedules in violation of 11 U.S.C. § 727(a)(4)(A). Both such violations warrant entry of an order denying the Debtor's discharge.

In support of this Complaint (the "Complaint"), Mr. Ross states as follows:

## PARTIES

1. Mr. Ross is a creditor of the Debtor based on personal injuries resulting from the pre-petition conduct of the Debtor's son for which the Debtor is personally liable under the Family Purpose Doctrine. Mr. Ross is entitled to a judgment of not less than $475,333.13 for his non-economic losses, with a total estimated claim of not less than $1,225,333.13.

2. The Debtor is the debtor in the underlying bankruptcy case, Case No. 3:25-bk-03593, filed under Chapter 7 in the United States Bankruptcy Court for the Middle District of Tennessee on August 28, 2025 (the "Bankruptcy Case"). The Debtor is a resident and citizen of Tennessee and may be served with process at 219 Gloucester Street, Franklin, TN 37064, or wherever else she may be found. A copy of the Complaint shall also be sent to her attorney of record in the Bankruptcy Case, Joseph P. Rusnak, Tune, Entrekin & White, P.C., 500 11th Avenue North,

Nashville, Tennessee 37203.

## JURISDICTION & VENUE

3. This Court has jurisdiction over this proceeding under 28 U.S.C. §§ 151 and 157(b). Pursuant to 11 U.S.C. § 105(a), the Court may issue any order, process, or judgment necessary to carry out the provisions of Title 11.

4. Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409(a).

5. This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(J).

## STATEMENT OF FACTS

### A. The Car Wreck

6. On November 11, 2020, the Debtor's son, Charles Bell—while driving the Debtor's car—collided with a car driven by Mr. Ross (the "Wreck").

7. Mr. Ross was hospitalized following the Wreck and suffered serious and permanent injuries for which he has not been compensated, including but not limited to a shattered pelvis, testicular rupture, and pulmonary embolism.

### B. The Lawsuit

8. Mr. Ross filed a lawsuit against the Debtor and Mr. Bell in the Circuit Court for Williamson County, Tennessee (the "State Court") on August 18, 2021 (the "Lawsuit").

9. In conjunction with the Lawsuit, the Debtor provided a written declaration under penalty of perjury dated October 20, 2021, and asserted the following:

   a. The Debtor had no interest in any real property.

   b. The Debtor had no interest as a beneficiary in any trust fund.

c. The Debtor had no share or ownership in any assets.

[Ex. 1, 10.20.2021 Declaration].

10. Through its own investigation, counsel for Mr. Ross discovered that the deed to the Debtor's primary residence located at 219 Gloucester Street, Franklin, TN 37064 (the "Property") was titled in the name of "Pamela Hyde Bell, a Trustee of Meridius Trust." [Ex. 2, Deed].

11. On December 2, 2021—less than four months after filing suit—Mr. Ross (through counsel) requested additional information about the "Meridius Trust" (the "Trust"). [Ex. 3, 12.2.21 Email to Counsel]. Thus, as early as 2021, the Debtor was on notice of her need to preserve information regarding assets—including with respect to the Trust—given her potential liability in the Lawsuit.

12. Eventually, on July 13, 2023, the Debtor provided a sworn declaration under penalty of perjury in the Lawsuit addressing the Trust and its ownership of the Property, stating,

a. The Debtor lives at the Property.

b. The Trust was created in 2018 as a ***revocable living trust*** of which the Debtor was an original Grantor.

c. The Debtor is not now, nor has she ever been, a beneficiary of the Trust.

[Ex. 4, 7.13.23 Declaration, ¶¶ 2-3, 5].

### C. The Chapter 7 Filing: Statements and Schedules

13. On August 28, 2025—over four years after the commencement of the Lawsuit and a mere *four days* before trial—the Debtor filed the Bankruptcy Case.

14. In her sworn schedules and statements, the Debtor disclosed, *inter alia*, that:

a. The Property is worth $691,200.00. [Bankr. Doc. No. 1, p. 41].

b. The Debtor *is*, in fact, a beneficiary of the Trust given her permission to use and occupy the Property as her primary residence. [*Id.* at p. 15].

c. The "owners" of the Trust are Robert Hyde (the Debtor's brother) and Lloyd Bell (the Debtor's ex-husband). [*Id.* at p. 41].

### D. The 2004 Examination

15. On December 31, 2025, Mr. Ross filed a motion for an order directing an oral examination of the Debtor and for production of documents pursuant to Fed. R. Bankr. P. 2004 (the "2004 Motion"). [Bankr. Doc. No. 16].

16. In the 2004 Motion, Mr. Ross requested that the Debtor produce certain documents and appear to answer questions regarding the facts, circumstances, and details of such documents. These documents included the following:

a. Copies of the Trust itself and all documents purporting to amend, modify, or alter the Trust.

b. All documents related in any way to the Trust.

c. All documents related to the purchase of the Property.

d. All documents related to the Debtor's possession of the Property.

e. All documents demonstrating whether the Debtor holds any interest in the Property—whether legal, possessory, or equitable—that allows for the Debtor's use thereof.

[*Id.*].

17. On January 2, 2026, this Court entered an order granting the 2004 Motion and compelling both the production of responsive documents and appearance in person to answer questions thereabout. [Bankr. Doc. No. 18].

18. The Debtor sat for the examination (the "2004 Examination") on February 5, 2026.

[Ex. 5, 2004 Transcript].

19. The Debtor did not bring a copy of the Trust documents to the 2004 Examination.

20. While under oath, the Debtor testified as follows:

a. She did not maintain a copy of the Trust—the only document capable of explaining the extent of the bankruptcy estate's rights in property owned by the Trust—despite Mr. Ross having requested such information in December 2021.

Q. Okay. Did you bring a copy of the Trust
with you today?
A. I did not.
Q. You agree that the Court ordered you to
bring a copy of the Trust with you today,
right?
A. If I had it, I would have brought it.
Q. Okay. You have had a copy of the Trust?
A. At one time, yes.
Q. And you agree that the Trust document is
the only writing that could establish whether

it was revocable or irrevocable, right?
A. I am not sure what you're asking me.
Q. In order for us to know the legal status
of that trust, we would need to have the Trust
document.
A. Exactly, yes.
Q. All right. And you haven't produced it
to us?
A. I have not.
Q. And so --
A. I don't have it.

[*Id.* at 26:15-27:11].

b. The Trust was created on April 6, 2018. [*Id.* at 65:17-22].

c. On April 7, 2018—one day after the Trust's creation—the Debtor signed a *Purchase and Sale Agreement* for the original purchase of the Property by the trust as "Meridius Trust, P. Hyde Bell, Trustee." [*Id.* at 51:13-52:20; Ex. 6, PSA].

d. The ultimate purchase price for the Property under the accepted contract between the sellers and "Meridius Trust, P. Hyde Bell, Trustee," was $437,000.00. [Ex. 5, 2004 Transcript, 53:1-13; Ex. 6, PSA].

e. On April 18, 2018, the Debtor signed the *ALTA Settlement Statement* for the purchase of the Property confirming a balance due at closing of $426,880.94. [Ex. 7, Settlement Statement].

f. Pursuant to the closing ledger prepared in conjunction with closing of the purchase of the Property, "Pam Bell" deposited a total of $426,880.94 with the title company handling the closing. [Ex. 8, Closing Ledger].

g. Despite not producing the Trust documents, the Debtor was confident that the Trust was revocable by the grantor.

```
Q.      Okay.  What kind of trust was it?
A.      I think it was a revokable trust.
Q.      And what makes you think that?
A.      Because I remember discussing revocable
and irrevocable and what that meant, but I'm
not a lawyer, so I didn't pay that much
attention to it.  I did do -- I do remember
researching the difference between the two.
Q.      And what is your understanding of the
difference between the two?
A.      That one of them was like you could never
change it or do anything, the irrevocable one.
```

[Ex. 5, 2004 Transcript, 17:11-22].

Q. Okay. So you said you believe it was a revocable trust?

A. Right.

Q. The type that you can change?

A. Yes.

Q. The type that you can revoke?

A. I guess, yes. I don't know what the definition of revoking is, but you can say yo don't want to do it that -- I do know that it said the difference was that you could change things throughout the course of the Trust.

Q. And so the Meridius Trust is one of the types of trusts that you can change things throughout the Trust?

A. Right.

Q. That was your understanding when you reviewed and signed it?

A. Exactly, yes. And that different things could be added to the Trust and taken out of the Trust at any time. But I think it had to be agreed upon by the trustees, maybe.

Q. And you understand that if the Trust were revoked, that the property in the Trust would be returned to whoever put the property in the Trust?

A. I sort of do now.

[*Id.* at 18:10-19:10].

**COUNT I**
**DENIAL OF DISCHARGE PURSUANT TO 11 U.S.C. § 727(a)(3)**

21. Mr. Ross restates and incorporates all preceding paragraphs of this Complaint as if fully stated herein.

22. The Debtor was a grantor and original trustee of the Trust in April 2018.

23. The Debtor became insolvent on or before the Wreck's occurrence on November 11, 2020.

24. Mr. Ross specifically requested copies of the Trust and related documents as early as December 2, 2021.

25. The Trust is the ostensible owner of the Property, which is unencumbered and which the Debtor has herself valued at $691,200.00.

26. If the Property were capable of administration by the Chapter 7 Trustee, there would be a substantial distribution to creditors—including Mr. Ross as the largest creditor by orders of magnitude.

27. Through her conduct or acquiescence, the Debtor has failed to keep or preserve (at best), or outright destroyed or concealed (at worst), recorded information from which the Debtor's financial condition might be ascertained.

28. The Debtor's refusal to provide these critical records—including but not limited to Trust documents and bank statements confirming the source of funds that the Debtor used to purchase the Property as trustee—has frustrated the estate's ability to recover assets for the benefit of creditors.

29. The Debtor's actions or failures to act were not justified under the circumstances.

30. The Debtor's actions or failures to act warrant a denial of discharge pursuant to 11 U.S.C. § 727(a)(3).

<h1 style="text-align:center">COUNT II</h1>
<h2 style="text-align:center">DENIAL OF DISCHARGE PURSUANT TO 11 U.S.C. § 727(a)(4)</h2>

31. Mr. Ross restates and incorporates all preceding paragraphs of this Complaint as if fully stated herein.

32. The Debtor has knowingly and fraudulently made a false oath or account in connection with her case.

33. Specifically, and without limitation, the Debtor's statements and schedules contain statements that are demonstrably false. The Debtor either (a) knew the sworn statements were false when made, or, alternatively, (b) lacked transparency and completeness, evincing a reckless disregard for the truthfulness and accuracy thereof.

34. These false oaths and accounts include the following:

   a. The Debtor asserted in her Schedule B that she has "no right to gain legal ownership" of the Property ostensibly owned by the Trust despite acknowledging that (a) the Trust was revocable by the grantor and (b) she was herself a grantor that signed the purchase agreement, signed the closing documents, and transferred the funds for the purchase.

   b. Upon information and belief, the Debtor has falsely denied knowledge or information on (a) the nature of the Trust and (b) the circumstances surrounding her purchase of the Property as ostensible trustee of the Trust.

35. The Debtor intended for interested parties and the Court to rely upon her statements, schedules, and testimony, despite the inaccuracy and incompleteness thereof, to avoid administration by the Chapter 7 Trustee of the estate's most valuable asset—the unencumbered Property.

36. The Debtor's false statements warrant a denial of discharge under 11 U.S.C. § 727(a)(4).

**WHEREFORE,** Mr. Ross, having set forth the claims for relief against the Debtor, respectfully prays that the Court grant the following relief:

A.    The entry of an Order denying discharge pursuant to 11 U.S.C. §§ 727(a)(3) and (4);

B.    Such further relief that the Court deems just and proper under the circumstances.

Respectfully Submitted,

/s/ Henry E. ("Ned") Hildebrand, IV
Henry E. ("Ned") Hildebrand, IV
DUNHAM HILDEBRAND
PAYNE WALDRON, PLLC
9020 Overlook Boulevard, Suite 316
Brentwood, TN 37027
615.933.5851
ned@dhnashville.com
*Counsel for Plaintiff Christopher Ross*

**EXHIBIT 1**

# DECLARATION OF PAMELA BELL

I, Pamela Bell, am an adult with personal knowledge of the following:

1. Charles Bell involved in a collision on November 11, 2020 in Williamson County, TN.

2. At the time of the collision, Charles Bell was driving a 2004 Toyota 4 Runner that I owned.

3. I am providing this sworn Declaration with the understanding that it will be relied upon by Christopher Ross in determining whether to accept a settlement for claims arising from the collision.

*For the next question, fill in each blank.*

4. At the time of the collision, Charles Bell was driving from 214 Gloucester St. Franklin to 3830 Carothers Pkwy . The purpose of this trip was review his drivers license at the DMV .

*For the next question, check the box next to the correct answer, and fill in the blank.*

5. At the time of the collision, Charles Bell was driving:

☑ only for himself

☐ for his employer, _____ (name and address)

☐ for the ridesharing service, _____ (name)

(check this box if he was driving to pick up a rideshare rider, and/or if he had a rideshare rider in the vehicle)

☐ for someone else, _____ (name and address)

*For question #s 6-11, fill in each blank. Write "none" if you have no info to provide.*

6. Today, my job title is *self-employed* and I work for *myself* _____ (name and address) making $*1200* per month.

7. At the time of the collision, I owned the following interests in real property (including any residential, commercial or investment property) (include the full address of each such property and the names of the additional owners, if any).:

*∅* _____

_____.

8. Today, I own the following interests in real property (including any residential, commercial or investment property) (include the full address of each such property and the names of the additional owners, if any; if there is any indebtedness on any property, attach the most recent statement showing the principal amount owing on the debt):

*∅* _____

_____.

9. I own or share ownership of these motor vehicles (including cars, trucks, boats, recreational vehicles, motorcycles, and any other vehicles):

*2004 Toyota 4Runner, 2006 Lexus 330, 2001 Toyota 4Runner* . (Year and model).

10. The total fair market value of my bank, investment, and retirement accounts is approximately $*3000* .

11. The total fair market value of my other property (including clothes, jewelry, furniture, electronics, and everything else) is approximately $*10,000* .

12. I (am) (am not) the beneficiary of any trust fund.

2

13. I own or share ownership in the following additional assets that are not listed anywhere else in this Declaration: Ø

_____.

14. I (have) (have not not) sold anything worth more than $1,000.00 or made a gift for more than $1,000.00 since the date of the collision. List any sales or gifts in excess of $1,000.00.:_____

_____.

15. True and correct copies of my tax returns for the last two years are attached and include all my sources of income during that time.

16. The only liability insurance policy that I have that is applicable to the Accident is Policy No. AOS-258-577556-40 0 0 with Liberty Mutual Insurance. There are no other liability, excess, or umbrella insurance policies, or insurance of any other kind, that could provide coverage for claims arising from the collision.

17. I have no other significant assets other than those listed in this Declaration.

**I declare under penalty of perjury that the foregoing is true and correct.**

_Pamela Bell_
Pamela Bell

10-20-21
Date

3

#34217

| WARRANTY DEED | STATE OF TENNESSEE<br>COUNTY OF WILLIAMSON |
|---|---|
| <br><br>MST 2018-0502 (Seller) | THE ACTUAL CONSIDERATION OR VALUE, WHICHEVER IS GREATER, FOR THIS TRANSFER IS $437,000.00<br><br>_Ashley Zimmer_<br>Affiant<br><br>SUBSCRIBED AND SWORN TO BEFORE ME, THIS THE 18 DAY OF April , 2018<br><br>_Stacy L. Thomas_<br>Notary Public<br><br>MY COMMISSION EXPIRES: October 7, 2019<br>(AFFIX SEAL) |

**THIS INSTRUMENT WAS PREPARED BY:**

James T. Oglesby, Attorney and Yvette L. Meldrum, Attorney
Mid-State Title & Escrow, Inc., 128 Holiday Court, Suite 125, Franklin, TN 37067

| ADDRESS NEW OWNER(S) AS FOLLOWS: | SEND TAX BILLS TO: | MAP-PARCEL NUMBERS<br>078-L-D-023.00 |
|---|---|---|
| Pamela Hyde Bell, Trustee of Meridius Trust | New Owner | |
| (NAME)<br>P.O. Box 2922 | (NAME) | |
| (ADDRESS)<br>Brentwood, TN 37204 | (ADDRESS) | |
| (CITY) (STATE) (ZIP) | (CITY) (STATE) (ZIP) | |

FOR AND CONSIDERATION OF THE SUM OF TEN DOLLARS, CASH IN HAND PAID BY THE HEREINAFTER NAMED GRANTEES, AND OTHER GOOD AND VALUABLE CONSIDERATIONS, THE RECEIPT OF WHICH IS HEREBY ACKNOWLEDGED, WE, **Stewart Campbell, Jr. and Shanan L. Campbell, husband and wife,** HEREINAFTER CALLED THE GRANTORS, HAVE BARGAINED AND SOLD, AND BY THESE PRESENTS DO TRANSFER AND CONVEY UNTO **Pamela Hyde Bell, Trustee of Meridius Trust,** HEREINAFTER CALLED THE GRANTEES, THEIR HEIRS AND ASSIGNS, A CERTAIN TRACT OR PARCEL OF LAND IN **WILLIAMSON** COUNTY, STATE OF TENNESSEE, DESCRIBED AS FOLLOWS, TO-WIT:

**Land in Williamson County, Tennessee, being Lot No. 56 on the Plan of Yorktown, Section II of record in Plat Book 7, Page 19, in the Register's Office for Williamson County, Tennessee, to which Plan reference is hereby made for a more complete description of the property.**

**Being the same property conveyed to Stewart Campbell, Jr. and Shanan L. Campbell, husband and wife by Warranty deed from Timothy Grooms, an unmarried person of record in Book 6342, page 284, Register's Office for Williamson County, Tennessee, dated December 15, 2014 and recorded on December 17, 2014.**

**Subject to:** Property taxes have been prorated and the Grantee has assumed payment thereof when same become due and payable, Taxes for the year 2018, a lien not yet due and payable. Subject to all matters shown on the Plan of record in Plat Book 7, Page 19, Register's Office for Williamson County, Tennessee. Restrictions of record in Book 314, Page 736, in the Register's Office for Williamson County, Tennessee, Right of Way Easements granted MTEMC of record in Book 321, Page 279, in the Register's Office for Williamson County, Tennessee. Slope and Fill Easement of record in Book 76, Page 215, in the Register's Office for Williamson County, Tennessee. Sewer Easement to City of Franklin of record in Book 143, Page 480, in the Register's Office for Williamson County, Tennessee. Roadway Easement of record in Book 300, Page 961, in the Register's Office for Williamson County, Tennessee. Right of Way Easement of record in Book 398, Page 916, in the Register's Office for Williamson County, Tennessee.

EXHIBIT
P. Bell
8
2/5/26 JC

| This property, known as | 219 Gloucester Street, Franklin, TN 37064 | | | | |
|---|---|---|---|---|---|
| | (House Number) | (Street) | (P.O. Address) | (City or Town) | (Postal Zip) |

TO HAVE AND TO HOLD the said tract or parcel of land, with the appurtenances, estate, title and interest thereto belonging to the said GRANTEES, their heirs and assigns forever; and we do covenant with the said GRANTEES that we are lawfully seized and possessed of said land in fee simple, have a good right to convey it and the same is unencumbered, unless otherwise herein set out; and we do further covenant and bind ourselves, our heirs and representatives, to warrant and forever defend the title to the said land to the said GRANTEES, their heirs and assigns, against the lawful claims of all persons whomsoever. Wherever used, the singular number shall include the plural, the plural the singular, and the use of any gender shall be applicable to all genders.

Witness my/our hand(s) this 18th DAY OF Apr. 1 , 2018.

_____
Stewart Campbell, Jr

_____
Shanan L. Campbell

STATE OF Tennessee
COUNTY OF Williamson

Personally appeared before me, the undersigned, a Notary Public in and for said County and State, Stewart Campbell, Jr and Shanan L. Campbell, husband and wife, with whom I am personally acquainted (or provided to me on the basis of satisfactory evidence), and who acknowledged that he/she/they executed the within instrument for the purposes therein contained.

Witness my hand and official seal, this the 18th day of April, 2018.

_____
Notary Public

My Commission Expires: 7-11-2020

STATE OF TENNESSEE
NOTARY PUBLIC
YVETTE LYN MELDRUM
WILLIAMSON COUNTY
My Commission Expires 07-11-2020

## True Copy Certification

I, KELLY E. COX, do hereby make oath that I am a licensed attorney and/or the custodian of the electronic version of the attached document tendered for registration herewith and that this is a true and correct copy of the original document executed and authenticated according to law.

_KELLY E. COX_

STATE OF TENNESSEE
COUNTY OF DAVIDSON

Personally appeared before me, STACY L. THOMAS, a notary public for this county and state, KELLY E. COX, who acknowledges that this certification of an electronic document is true and correct and whose signature I have witnessed.

_Stacy L. Thomas_

Notary's Signature
My Commission Expires: _____
Notary Seal:



BK/PG: 7341/384-386
18014281

| 3 PGS : DEED | |
|---|---|
| JESSICA SWEENEY   537788 - 18014281 | |
| 04/19/2018 - 09:00:29 AM | |
| MORTGAGE TAX | 0.00 |
| TRANSFER TAX | 1616.90 |
| RECORDING FEE | 15.00 |
| DP FEE | 2.00 |
| REGISTER'S FEE | 1.00 |
| TOTAL AMOUNT | 1634.90 |

STATE of TENNESSEE, WILLIAMSON COUNTY

**SADIE WADE**

REGISTER OF DEEDS

**EXHIBIT 3**

| From: | Laura Baker |
|---|---|
| To: | Chandler, Rhett C |
| Cc: | Amanda Williams |
| Subject: | RE: Ross |
| Date: | Thursday, December 2, 2021 12:11:13 AM |

There are no hospital liens or government liens that I know about. Though I disagree that you are entitled to any other information about medical liens and I will object in future cases to providing the same, under the circumstances of this particular case, I am willing to tell you that there is a lien for more than $272,000 from an ERISA policy. Obviously, the bills would be more. My client is impotent. His only option is a penile implant and even that isn't going to put him back to normal.

I saw the tax returns you sent over. I need Pamela Bell's 2020 return. I also need all schedules for both years (2019 and 2020). For Charles, I need his 2019 return as well, and all schedules for both years.

Please also disclose their relationship to the Trust that owns the house.

Thanks,

Laura

**Laura Baker**
Attorney and Shareholder | Law Offices of John Day, P.C.
5141 Virginia Way, Suite 270 | Brentwood, TN 37027
615-742-4880 | Murfreesboro Office

**From:** Chandler, Rhett C <Rhett.Chandler@LibertyMutual.com>
**Sent:** Monday, November 22, 2021 5:15 PM
**To:** Laura Baker <LBaker@johndaylegal.com>
**Subject:** Ross

Laura,

I am still waiting on tax returns and will submit those to you upon receipt.

I am reviewing Mr. Ross' discovery responses and Interrogatory #23, inquiring about liens, was objected to. As you know, we receive notice of liens, as we can be held responsible for various liens as well. I am not seeking this information for any other purpose that to protect our interests. Please supplement and let me know if you are aware of any liens in this matter.

Rhett C. Chandler, Esq.
(615) 514-7634 (Direct)
(615) 278-8308 (Cell)

**MAILING ADDRESS:**
The Law Office of Julie Bhattacharya Peak
Employees of Liberty Mutual Group, Inc.

PO Box 7217
London, KY 40742

**PHYSICAL ADDRESS for Certified Mail and UPS/Fed Ex ONLY:**
Law Offices of Julie Bhattacharya Peak
Employees of Liberty Mutual Group, Inc.101 Creekside Crossings
Suite 1700, #390
Brentwood, Tennessee 37027

This e-mail, and any attachments thereto, is intended only for the use of the addressee(s) named herein and may contain legally privileged and/or confidential information.  If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution or copying of this e-mail, and any attachments thereto, is strictly prohibited.  If you have received this e-mail in error, please notify me via return e-mail and via telephone at 615-514-7634 and permanently delete the original and any copy of any e-mail and any printout thereof.  Please be advised that there is a risk a third party can gain access when sending or receiving electronic communications using a computer or other device, or e-mail account. **PLEASE NOTE THAT THESE INSTRUCTIONS SHOULD NOT BE CONSTRUED IN ANY WAY TO  WAIVE FORMAL SERVICE PURSUANT TO ANY APPLICABLE RULE OF CIVIL PROCEDURE, LOCAL RULE, STATUTE OR ORDINANCE.**

# EXHIBIT 4

CHRISTOPHER ROSS,                )
                                 )
                                 )
        Plaintiff,               )
                                 )
        v.                       )        **Docket No. 21CV-336**
CHARLES BELL and PAMELA BELL,    )        **JURY DEMAND**
                                 )
                                 )
        Defendants.              )

### DECLARATION OF PAMELA BELL PURSUANT TO RULE 72, TENNESSEE RULES OF CIVIL PROCEDURE

I, Pamela Bell, am an adult resident of Franklin, Tennessee, and I make the following Declaration pursuant to Rule 72, *Tennessee Rules of Civil Procedure*, and do hereby declare the following to be true and correct:

1. I am Pamela Bell, and I reside at 219 Gloucester Street, Franklin, Tennessee 37064.

2. Title to the house and real property located at 219 Gloucester Street, Franklin, Tennessee 37064 is held by Meridius Trust (the "Trust").

3. Meridius Trust was created in 2018 as a Revocable Living Trust. I was an original Grantor of that Trust, as well as a Trustee.

4. In August of 2018 I resigned as a Trustee, and named my brother, Robert Hyde, as the successor Trustee to replace me. At that time I relinquished all my administrative duties as a Trustee, and I have not acted as a Trustee of the Trust since that time.

5. I am not now, nor have I ever been, a beneficiary of the Meridius Trust.



**EXHIBIT**
P. Bell
10
2/5/26    JL

6. Since the formation of the Trust in 2018, I have had no beneficial ownership interest in the Trust or the house and real property located at 219 Gloucester Street, Franklin, Tennessee 37064.

7. When the Trust was created in 2018, no asset of any type or value, other than the house and real property, was placed in the Trust, including without limitation any cash, securities or investments of any kind, liquid assets or other items of value.

8. Because the Trust contains no cash, securities, investment accounts, or liquid assets, all maintenance, repairs, insurance, taxes, utilities and other expenses associated with the house at 219 Gloucester Street have to be paid by the residents of the house, who are my family members and myself.

9. Because of my financial situation and that of my family members, at present we are delinquent on payment of property taxes for 2021 and 2022, as we have been unable to pay those taxes in a timely fashion.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Pamela Bell

Date: 7-13-2023

2

**EXHIBIT 5**



IN THE UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF TENNESSEE
_____

IN RE:

PAMELA HYDE BELL,                    Case No. 3:25-bk-03593
                                     Chapter 7
        Debtor,

_____




            Deposition of:

            PAMELA HYDE BELL

            Taken on February 5, 2026
            Commencing at 1:12 p.m. CST






_____

            Checuga Reporting, Inc.
            Jenny Checuga, LCR, RPR
        Jennychecuga@Checugareporting.Com
            (615)499-9320

                 A P P E A R A N C E S


For the Plaintiff, Christopher Ross (Circuit
Court):

        MS. LAURA BAKER
        MS. NATALIE ROWEN
        Attorneys at Law
        Law Offices of John Day, P.C.
        5141 Virginia Way, Suite 270
        Brentwood, TN 37027
        (615)742-4880
        lbaker@johndaylegal.com
        nrowen@johndaylegal.com




For the Creditor:

        MR. DAVID ANTHONY
        Attorney at Law
        ExoLegal PLLC
        901 Woodland Street
        Nashville, TN 37206
        (615)869-0634
        david@exolegal.com




For the Debtor Pamela Bell:

        MR. JOSEPH P. RUSNAK
        Attorney at Law
        Tune Entrekin White
        500 11th Avenue North, Suite 600
        Nashville, TN 37203
        (615)244-2770
        jrusnak@tewlawfirm.com

For the Defendant Pamela Bell (Circuit Court):

      MR. STEVEN J. MEISNER
      Attorney at Law
      Brewer, Krause, Brooks,
      Chastain & Meisner PLLC
      545 Mainstream Drive, Suite 101
      Nashville, TN 37228
      (615)256-8787
      smeisner@bkblaw.com


Also present:

      MR. CHRISTOPHER ROSS

<pre>
                  I   N   D   E   X

                                              Page
Examination
By Ms. Baker                                    7



              E   X   H   I   B   I   T   S

                                              Page

Exhibit No. 1                                   9
     Subpoena

Exhibit No. 2                                  12
     Bankruptcy Filing

Exhibit No. 3                                  24
     E-mail 8/31/18

Exhibit No. 4                                  51
     Purchase and Sale Agreement

Exhibit No. 5                                  54
     Balance Report

Exhibit No. 6                                  58
     ALTA Settlement Statement

Exhibit No. 7                                  61
     Liberty Mutual Insurance Sheet

Exhibit No. 8                                  64
     Warranty Deed

Exhibit No. 9                                  65
     Certification of Trust

Exhibit No. 10                                 67
     Declaration of Pamela Bell
     Pursuant to Rule 72

Exhibit No. 11                                 81
     Second Amended Complaint
</pre>

```
                                              Page

Exhibit No. 12                                82
     Stipulations

Exhibit No. 13                                86
     Zillow

Exhibit No. 14                                88
     Order Setting Case for Trial
```

S T I P U L A T I O N S

The deposition of PAMELA BELL was taken by counsel for the Plaintiff, at the offices of 500 11th Avenue North, Nashville, Tennessee, on February 5, 2026, by Subpoena for all purposes under the Tennessee Rules of Civil Procedure.

All formalities as to caption, notice, statement of appearance, et cetera, are waived. All objections, except as to the form of the questions, are reserved to the hearing, and that said deposition may be read and used in evidence in said cause of action in any trial thereon or any proceeding herein.

It is agreed that JENNIFER CHECUGA, LCR, RPR, and Court Reporter for the State of Tennessee, may swear the witness, and that the reading and signing of the completed deposition by the witness were not discussed.

                    *    *    *
                  PAMELA BELL,
was called as a witness, and having first been
duly sworn, testified as follows:

                  EXAMINATION
QUESTIONS BY MS. BAKER:
Q.    Please state your name.
A.    Pamela Bell.
Q.    And what is your full legal name?
A.    Pamela Hyde Bell, I guess is my full
legal name.
Q.    And where do you live?
A.    219 Gloucester Street, Franklin,
Tennessee.
Q.    And have you lived there since 2018?
A.    Off and on, yes.
Q.    Okay.  Where have you lived -- when you
say off and on, where else have you lived?
A.    With some of my children and with a
friend and temporarily in like hotels or
something.
Q.    Okay.
A.    Yeah.
Q.    Tell me about the times that you haven't

Q. lived at 219 -- how did you say it, Clouster?

A. Gloucester.

Q. Gloucester. Tell me about some of the times you haven't lived there since 2018.

A. Like what do you mean?

Q. Well, you've said you've lived with a friend. Which friend?

A. What friend?

Q. Uh-huh.

A. Several of them, but just temporarily.

Q. When you say temporarily, are you talking about days?

A. Yeah, just a couple days.

Q. Okay. And then with your --

A. And then when I was ill and after surgery and with my daughter, the Home with Suites, the Home to Suites.

Q. And were all those times that you've lived away from 219 Gloucester, just tell me, prior situations?

A. Pretty much, yeah.

Q. Okay. You received an order from the bankruptcy court and a subpoena to be here to appear and answer questions today; is that right?

A.    For -- I got a subpoena to be here back whatever day it was that we've had to postpone, yes.

Q.    I'm going to hand you a copy of that and we will make that Exhibit 1.

(WHEREUPON, a document was marked as Exhibit Number 1.)

BY MS. BAKER:

Q.    If you'll just --

A.    This doesn't look like what I got.

Q.    If you'll flip through it.

A.    Yeah, I got this.

Q.    All right.  Tell me what you're looking at.

A.    The --

Q.    What's the title?

A.    Order Directing Examination Pursuant to Federal Rule of Bankruptcy Procedure 2004.

Q.    Okay.  And did you get the documents that come after that in the packet I just handed you?

A.    Yes.

Q.    The Exhibit A?

A.    Uh-huh.

Q.    And the request for production of

documents?

A. It was like eight or nine pages, as I recall.

Q. All right. Just flip through it and let me know if this was what you received.

A. (Reviews document.)

Yes, those other pages, yes. The first couple pages I did not get.

Q. All right. So all the pages starting at Order Directing Examination Pursuant to Federal Rule of Bankruptcy Procedure 2004 and the ones that come after that in Exhibit 1, correct?

A. Correct, uh-huh.

Q. And you understood that you were ordered by the Court to appear and answer questions, right?

A. Uh-huh.

Q. Is that a yes?

A. Yes, I'm sorry.

Q. And you are aware that the order requires you to answer my questions today truthfully?

A. Yes.

Q. And you know that you are under oath here?

A. Yes.

Q.   And you understand that you have a duty to fully disclose all information in response to my questions?

A.   Yes.

Q.   All right.

You filed a petition for bankruptcy, right?

A.   I did.

Q.   Chapter 7; is that correct?

A.   Uh-huh.  Yes, it is, excuse me.

Q.   All right.

And there were schedules that got filed with that petition, correct?

A.   I'm not sure what you mean by schedules.

Q.   Documents --

A.   Oh, yeah, I had to fill out 150,000 pages, yes.

Q.   And you reviewed all the pages that were filed in that bankruptcy petition, right?

A.   I did.

Q.   And you filled the pages out yourself?

A.   Yes.

Q.   Okay.  And you signed the petition under oath, right?

A.   Okay, I don't remember signing it under

oath, but I just signed it, yeah.  I guess it was under oath.

Q.    I'm going to hand you what we'll make Exhibit 2.

(WHEREUPON, a document was marked as Exhibit Number 2.)

BY MS. BAKER:

Q.    If you'll just flip through that and confirm that's the bankruptcy petition that you've submitted and signed.

A.    (Reviews document.)

Now, I don't see my signature on here, but -- okay, it was electronic, okay.

Do you really want me to go through everything?

Q.    I want -- if you can confirm that's the petition and all the schedules that were attached to it that you signed and filed, then we'll make it exhibit 2.

A.    To the best of my knowledge this is exactly what I received and signed.

Q.    Okay.

A.    Or submitted and signed, I guess is a better word for it.

Q.    All right.

Q. I'm going to ask you some questions about the Meridius Trust.

A. Okay.

Q. When was the Meridius Trust created?

A. In 2018.

Q. All right. And that was less than ten years ago?

A. Yes.

Q. And where did you create the trust?

A. I didn't create the trust.

Q. Okay. And I just want to make sure we're on the same page going forward. I'm just going to call it the Trust, but when I do that, I'm referring to Meridius Trust; is that okay?

A. Yeah.

Q. All right. Where was it created?

A. I don't know.

Q. Okay. Was it created in Tennessee?

A. Oh, as far as I know, yes.

Q. When you say you didn't create the Trust, what do you mean?

A. I didn't create the Trust. I -- I didn't sit down and write out the Trust.

Q. Okay. Who wrote out the Trust?

A. I guess an attorney.

Q. And why do you say you guess?

A. Because I don't -- I don't recall.

Q. Did you hire the attorney to --

A. No, I didn't hire anybody.

Q. Who hired an attorney?

A. I'm assuming it was my ex-husband.

Q. And who is your ex-husband?

A. Lloyd Bell.

Q. Were you aware the Trust was being created?

A. I was aware that it had been created, yes, and that I was a part of it, yes.

Q. All right. And how did you become aware that it had been created?

A. Because he asked me to -- he asked me to sit down and talk about creating a trust.

Q. And what did you talk about?

A. What the reason for doing so was and -- his mother at the time was very ill and she had dementia and he had been caring for her and he had just been going through a lot with his brother and wished that he had established something ahead of time. And he didn't want my children to have to go through that if something should happen to myself or him.

Q.	Okay.  And what was the reason for establishing the Trust?  What you just told me?

A.	Yeah, and to avoid having to go through probate and all that.  It just was a time in our life when we all of a sudden realized that, you know, this could be us one day.

Q.	And were you living here in Tennessee at the time it was created?

A.	Uh-huh.

Q.	Is that a yes?

A.	Yes, I'm sorry.

Q.	I didn't go through all the reminders at the beginning like we did in the Circuit Court case, but when I remind you to answer out loud, it's just because I've done this a lot of times.

A.	Okay.  I forget.

Q.	All right.

	And -- so is it your testimony that an attorney drafted the Trust documents?

A.	I don't know that for sure.

Q.	Okay.

A.	I would assume, but I don't know.

Q.	And why would you assume?

A.	Because most documents are, whatever you

call it, prepared by an attorney.

Q. All right. Did you have any interaction with the drafter of the Trust?

A. No.

Q. Did you get a copy of it?

A. At that time, yes.

Q. And did you sign it?

A. As far as I remember, yes.

Q. And what was your role in the Trust?

A. My role. I'm not sure exactly what you mean by that. I was named trustee. Is that what you mean?

Q. That's one role.

So you were a trustee of the Trust?

A. Yes.

Q. When it was created?

A. Uh-huh. My husband -- my ex-husband and myself.

Q. Your ex-husband and your son what?

A. And myself.

Q. Oh, and yourself were the two trustees?

A. Uh-huh.

Q. And you were also a grantor of that trust, right?

A. I don't know what that means.

Q. Okay. You were one of the people who provided the property and money that went into that trust?

A. I didn't provide anything.

Q. Okay. You read the Trust before you signed it, right?

A. Uh-huh. I remember reading it, yes.

Q. Okay. And it listed you as a grantor, right?

A. I guess so. I don't remember that term.

Q. Okay. What kind of trust was it?

A. I think it was a revokable trust.

Q. And what makes you think that?

A. Because I remember discussing revocable and irrevocable and what that meant, but I'm not a lawyer, so I didn't pay that much attention to it. I did do -- I do remember researching the difference between the two.

Q. And what is your understanding of the difference between the two?

A. That one of them was like you could never change it or do anything, the irrevocable one.

Q. That's the one you can't change?

A. Right, and that you couldn't do anything, like, especially at death. I remember thinking

that that was kind of interesting and I didn't
really understand the difference --

Q. Okay.

A. -- between the two.

Q. But now you understand the difference
between the two?

A. Oh, yeah, I do now. At the time I didn't
really -- I don't know what the word is. I
didn't really analyze it too much.

Q. Okay. So you said you believe it was a
revocable trust?

A. Right.

Q. The type that you can change?

A. Yes.

Q. The type that you can revoke?

A. I guess, yes. I don't know what the
definition of revoking is, but you can say you
don't want to do it that -- I do know that it
said the difference was that you could change
things throughout the course of the Trust.

Q. And so the Meridius Trust is one of the
types of trusts that you can change things
throughout the Trust?

A. Right.

Q. That was your understanding when you

reviewed and signed it?

A.    Exactly, yes.  And that different things could be added to the Trust and taken out of the Trust at any time.  But I think it had to be agreed upon by the trustees, maybe.

Q.    And you understand that if the Trust were revoked, that the property in the Trust would be returned to whoever put the property in the Trust?

A.    I sort of do now.

Q.    Okay.  When the Trust was formed, did it have any property in it?

A.    No.

Q.    Did it have any money in it?

A.    No.

Q.    Was there a trust bank account?

A.    No, not that I know of.

Q.    You testified that part -- that the reason for creating this trust was your ex-husband was wanting to avoid probate with --

A.    And take care of my children.

Q.    And take care of your children?

A.    Uh-huh.

Q.    And was that in the event of his death?

A.    Either of us.

Q.  Either of your deaths?

A.  Or either of us becoming incompetent, which his mother was at the time.

Q.  Does the Trust have a bank account now?

A.  I don't know.

Q.  Do you have -- you have no knowledge of any bank account in the name of the Trust?

A.  I do not.

Q.  Okay.  Who is the current trustee?

A.  Lloyd Bell.

Q.  And that's your ex-husband?

A.  Uh-huh.

Q.  Yes?

A.  Yes.

Q.  And are there any other trustees?

A.  I don't know.

Q.  Okay.  Do you remember the meeting of creditors with the bankruptcy trustee?

A.  Uh-huh.

Q.  Yes?

A.  Yeah, the -- yeah, the one we had just -- yeah, I'm sorry.

Q.  And you remember telling her your brother was also a trustee?

A.  I told her that my brother was a

successor trustee.

Q. So as it stands right now, the only trustee of the Trust is Lloyd Bell?

A. That I know of.

Q. Okay. Where does Lloyd Bell live?

A. Different places.

Q. Does he live at 219 Gloucester?

A. Sometimes.

Q. Does he live there right now?

A. I don't know.

Q. Why do you say that?

A. Because I don't know if he's there right now or not.

Q. When's the last time you saw him?

A. Couple days ago.

Q. Okay. And did he -- the last time you saw him, did he take all his stuff out of the house?

A. He has a right to be in the house just as much as I do.

Q. Okay, my question is, is he living in the house right now?

A. I don't know.

Q. You saw him two days ago in the house?

A. I saw him two days ago when he came to

Q. work on my son's car.

Q. Okay.

A. Or what day was that? I don't even know what today is. Friday? Thursday?

Q. I don't know either. It's Thursday.

A. I was going to say...

Q. Okay. Has he been living in the house in the last year?

A. Sure.

Q. How many nights in the last year?

A. I don't know. I mean, what difference does that make?

Q. It -- the difference is that I need you to answer my questions truthfully.

A. I'm saying I don't know how many days.

Q. Is there -- where else does he live when he's not living at 219 Gloucester?

A. Somewhere up in Tennessee.

Q. When did you get divorced?

A. 2007.

Q. Has he ever remarried?

A. No.

Q. Have you ever remarried?

A. No.

Q. You testified that you were a trustee

when the Trust was formed.

A.    Uh-huh, yes.

Q.    Are you a trustee currently?

A.    No.

Q.    When did you stop being a trustee?

A.    Shortly after 2018.  I'm trying to think, it was like -- it was right before my child was going to school.  So I -- I want to say it was like August of 2018 I had a discussion with Mr. Bell and told him that I didn't want to be a part of any of this because I did not want the financial obligation and that I wanted to resign as trustee.  And he told me that I needed to send a formal letter to -- to him and -- that I was wanted to resign as trustee.  And I appointed my brother at the time as successor trustee.

Q.    Okay.  And did you -- did you draft a letter?

A.    Uh-huh.

Q.    Is that a yes?

A.    I remember writing a letter, yes, and signing it and dating it, to be specific.

Q.    And when you say you wrote a letter, are you saying you hand wrote a letter?

A.    No, I typed it out.

Q.    Okay.  And you signed it and dated it?

A.    Uh-huh, I did.

Q.    All right.  And you sent it to Lloyd Bell?

A.    I sent it to Lloyd Bell and to my -- I handed it to Lloyd Bell and I sent a copy to my brother.

Q.    And your brother is?

A.    Robert Hyde.

Q.    And did you bring a copy of that letter with you today?

A.    No, I did not.

       MR. RUSNAK:  She's previously provided me with a copy of the letter.

       MS. BAKER:  All right.

       THE WITNESS:  I think I gave you a copy of that, as well.

       MS. BAKER:  I am going to make this Exhibit 3.

       (WHEREUPON, a document was marked as Exhibit Number 3.)

       MS. BAKER:  Did you just hand her a copy of the exact same thing?

       MR. RUSNAK:  I did.

MS. BAKER: Thank you.

BY MS. BAKER:

Q. So Exhibit 3, you are saying this is the letter that you hand-delivered to Lloyd Bell?

A. Uh-huh.

Q. Is that a yes?

A. Yes, I'm sorry.

Q. All right. It's dated August 31, 2018.

A. Okay, yes, that's correct.

Q. And this is the letter where you resigned as trustee of Meridius Trust?

A. Yes.

Q. All right. In Exhibit 3 it says the Trust was established on April 6, 2018; is that right?

A. That's what it says, yes.

Q. Where did you get the date from?

A. I don't remember.

Q. All right. Do you have any reason to think back in August of 2018, just a few months after the Trust was established, that you would have the date that it was established wrong?

A. That I would have the date wrong?

Q. Right.

A. If I wrote it on here, I must have known

that's when it was.

Q. All right. And how did you know that you could appoint a successor trustee?

A. I don't recall, but I knew that I could.

Q. Okay. Did you look at the Trust?

A. Yes, I did.

Q. All right.

A. At the time, yes. It was something about if somebody was incompetent or whatever, then you could have somebody step in to take your place.

Q. And were you incompetent on August 31, 2018?

A. No.

Q. Okay. Did you bring a copy of the Trust with you today?

A. I did not.

Q. You agree that the Court ordered you to bring a copy of the Trust with you today, right?

A. If I had it, I would have brought it.

Q. Okay. You have had a copy of the Trust?

A. At one time, yes.

Q. And you agree that the Trust document is the only writing that could establish whether

Q. it was revocable or irrevocable, right?

A. I am not sure what you're asking me.

Q. In order for us to know the legal status of that trust, we would need to have the Trust document.

A. Exactly, yes.

Q. All right. And you haven't produced it to us?

A. I have not.

Q. And so --

A. I don't have it.

Q. So you want the Court to decide about this trust without seeing the document?

A. I don't know why the Court has to decide anything about the Trust.

MR. RUSNAK: I'm going to object to the form of that question. I mean, that calls for all kinds of things. I'm not sure it's even in the scope of a 2004 exam.

BY MS. BAKER:

Q. You want us to take your word for it about what the Trust provided for or didn't provide for, right?

A. I didn't say that.

Q. All right. Without the document, the

only way that we could figure out what it provided for or didn't provide for would be to take your word for it.

A. Well, I'm telling you all I know.

Q. All right.

A. I know that I was a trustee, I resigned as a trustee and I was never a beneficiary of the Trust. The only beneficiaries of the Trust were the five children that I have and I have no -- no control over the Trust at this time and I haven't since 2018.

Q. And the only writing that we could look to to confirm that what you just said was true is the Trust document, right?

A. I would assume. I mean, the Trust was created in 2018, which is how many of years ago, and there was no -- there was no reason for anything to be hidden or secretive or anything. It was not established for that purpose.

Q. Were you and Lloyd Bell living together in 2018 when the Trust was created?

A. I do not remember. Possibly. Our relationship was very complicated.

Q. Where did you live mainly before you

purchased and moved into 219 Gloucester?

A.   I didn't purchase 219 Gloucester.  I lived numerous places.  I lived -- I can't remember the address, in The Meade of Avalon, I lived in a rental at Liberty Pike.  I lived in a rental at -- I don't even know the name of the street over there off Franklin road.  And I lived at several Airbnb's.

Q.   All right.  So let me rephrase my question, because I don't need a list of every place you ever lived before 2018.

What I want to know is where did you pack up and move out of to move into 219 Gloucester?

A.   I packed up and moved out of all three of those places I just told you.

Q.   So you lived in three places at the same time?

A.   No, I lived in three places for numerous years.

Q.   All right.  Immediately preceding moving into 219 Gloucester, where were you living?

A.   I was at an Airbnb off of Franklin Road. All of my belongings and my children's belongings were in storage.

Q.   Okay.  And where did you live immediately

before that?

A.    The Avalon.

Q.    The house at The Meade of Avalon?

A.    Uh-huh.

Q.    Is that yes?

A.    Yes.

Q.    And you don't remember the address?

A.    I do not.  I can't even remember the name of the street, to be honest with you.

Q.    Did you own the house?

A.    No.  No, I rented.

Q.    What's the last house that you owned before you moved into 219 Gloucester?

A.    Owned outright or owned with someone else?

Q.    Any -- any type of ownership.

A.    Scotland Place.

Q.    Where is that?

A.    In Belle Meade.

Q.    What was the address?

A.    I don't remember.

Q.    Okay.  But that's the last piece of real estate you owned was located on Scotland Place in Belle Meade here in Nashville?

A.    Uh-huh, yes.

Q. Okay. So between living at Scotland -- living and owning part of Scotland Place and moving into 219 Gloucester, you only lived in rentals and Airbnb's?

A. No, I lived on Waterford Drive.

Q. And where was that?

A. In Brentwood.

Q. Was that before or after you lived at The Meades of Avalon?

A. I went from Scotland Place to Waterford Drive, Waterford Drive to another rental on Liberty -- Old Liberty Pike, Old Liberty Pike to The Meades of Avalon, Meades of Avalon -- I'm telling you, I went quite a few places.

Q. And did you own Waterford Place?

A. No.

Q. Or Waterford Drive? Excuse me.

A. No.

Q. You didn't have any ownership interest in it?

A. No.

Q. Who did own that property?

A. My father.

Q. And what is your father's name?

A. Robert Hyde.

Q. And is he alive?

A. No.

Q. When did he die?

A. 2008.

Q. And is that before or after you were divorced?

A. After.

Q. Did you receive ownership of Waterford Drive when your father died?

A. I did not.

Q. What happened to that property?

A. When you say ownership, what do you mean ownership?

Q. I mean were you on the deed?

A. When you said did I receive ownership of --

Q. Yeah, did you inherit it from him?

A. No. No.

Q. Okay. And you were never on the deed of Waterford Drive?

A. I don't think so.

Q. Okay. You didn't have any ownership interest in that address?

A. I don't think so.

Q. Your dad owned it 100 percent?

A.    It was my dad and my mom, I believe.

Q.    And your mom's name is?

A.    Mary Katherine.

Q.    Hyde?

A.    Hyde, uh-huh.

Q.    K or C?

A.    K.

Q.    K-A-T-H-R-Y-N?

A.    E-R-I-N -- E-R-I-N-E.

Q.    And did they live at Waterford Drive?

A.    No.

Q.    Was your mom alive when your dad died?

A.    No, my mother died first.

Q.    And then your dad died?

A.    They were in a terrible car accident, yes.

Q.    Sorry.

And was there probate after they passed?

A.    Sure.

Q.    And did you inherit?

A.    Did I inherit what?

Q.    Anything from your parents.

A.    Yes.

Q.    What was it?

A.    I think it was some money.

Q.    About how much?

A.    I have no idea.

Q.    What did you do with the money?

A.    I spent it.

Q.    On what?

A.    Five children, rent, vehicles, college.

Q.    You didn't use the money to purchase real property?

A.    No.

Q.    Have any amendments been made to the Trust since it was created?

A.    I believe when -- when I resigned, there was some kind of amendments to it.

Q.    What were they?

A.    I don't remember.

Q.    How did you find out about them?

A.    Because we discussed them.

Q.    And who's we?

A.    Mr. Bell and myself.

Q.    Why did he discuss it with you?

A.    Because I told him I didn't want to be responsible for anything in the Trust.

Q.    When you say there were amendments -- there was some kind of amendments made, are you talking about you resigning as trustee?

A.    Yes, and saying I didn't want to be responsible for anything in the Trust from thereon, hereafter.

Q.    And why didn't you?

A.    Because I didn't want to be financially responsible for anything that had to do with that trust.

Q.    Were any other amendments made other than taking you off as trustee?

A.    I don't recall.

Q.    Would Lloyd Bell have talked to you about that?

A.    At the time that we did this, we discussed it and we came to some agreements and we talked about our children and who was going to live at the property and that -- at the time I was the -- what do you call it, when you claim the children on the taxes.

Q.    Dependants?

A.    Yes, I was whatever that was.  So I was claiming them as my dependants, the ones that were under age.  So for tax reasons, that was the way it was going to be.

Q.    For tax reasons you were claiming the dependants?

A.    Uh-huh.

Q.    Which were the five children?

A.    Well, at the time some of them were over, you know, whatever age it is.

Q.    Okay.  And you brought up tax reasons. How is the Trust handled on your taxes?

A.    I don't think there was anything to handle on the taxes.

Q.    Okay.  Were you claiming the property taxes as a deduction on your taxes?

A.    I don't think you can do that.

Q.    Is that what you mean, though, about not wanting to be financially responsible?

A.    I didn't want to -- yeah, I didn't want to be worried about property taxes or the maintenance and all that.

Q.    On the house?

A.    Uh-huh.

Q.    Is that a yes?

A.    Yes, sorry.

Q.    And we're talking about 219 Gloucester?

A.    Yes.

Q.    When you were trustee of the Trust, were you paying the property taxes?

A.    I don't remember.

Q.     Have you ever paid the property taxes on the house?

A.     I don't remember.

Q.     Do you claim the property taxes on your income taxes?

A.     I don't -- I haven't, no.

Q.     You never claimed a deduction?

A.     I don't remember in that year, I don't remember.

Q.     Okay.

A.     I think the property taxes had already been paid for that year.

Q.     For 2018?

A.     Isn't that how it works?  Don't you pay the property taxes --

Q.     You're talking about during the closing of the house; is that right?

A.     I don't remember.  I just remember there was something about the property taxes and I questioned somebody about that, like who's supposed to pay the property taxes from when it was purchased.

Q.     And you're talking about the house?

A.     Uh-huh.

Q.     Yes?  Is that a yes?

A.    Yes.

Q.    All right.  And so the house was purchased in 2018, also?

A.    Correct, uh-huh.

Q.    And in 2018, do you know if you paid the property taxes?

A.    I don't remember.

Q.    Okay.  Earlier you said isn't that something they pay.  Were you referring to the sellers having paid the property taxes as part of the closing?

A.    Yes, that's what I'm saying.  I don't remember how that worked.

Q.    From 2019 until now, have you ever paid the property taxes on 219 Gloucester?

A.    I don't recall.

Q.    If you didn't pay the property taxes, who did?

A.    I believe Mr. Bell.

Q.    And Mr. Bell is Lloyd Bell?

A.    Uh-huh.

Q.    That a yes?

A.    Yes.

Q.    All right.  And he didn't pay those out of a trust account, right?

A.   I don't know what he paid them out of.

Q.   Who selected the trustees for the Trust when it was formed?

A.   I don't -- I don't know.

Q.   You and Lloyd Bell agreed that you would both be the trustees?

A.   Yes.  So I guess we both selected each other.

Q.   All right.  Had there ever been an independent corporate trustee of Meridius Trust?

A.   What does that mean?

Q.   Somebody who doesn't share the same last name as you?

A.   My -- my brother was the successor trustee.

Q.   There's never been a bank that served as trustee?

A.   No, no.

Q.   Never a third party that isn't related by blood?

A.   Not that I remember.  I mean, I'm sorry, it wasn't -- to me, at the time, it wasn't a complicated document.

Q.   Did you receive any compensation for

serving as trustee?

A. No.

Q. Did anyone appointed to serve as trustee, did the Trust include any terms for anybody to be compensated?

A. Not that I remember.

Q. So I believe you testified earlier that Lloyd Bell is not currently living at the residence?

A. As far as his permanent residence, he -- he gets his mail there.

Q. Okay. And you get your mail there, too?

A. I do.

Q. You said the beneficiaries of the Trust are the children.

A. Yes.

Q. Are they the children of you and Lloyd Bell?

A. They are.

Q. You all don't have children from other relationships?

A. No.

Q. All right. And you said you are not a beneficiary of the Trust?

A. No.

Q.    Have you ever been a beneficiary of the Trust?

A.    No.

Q.    What is your interest in the Trust right now?

A.    I don't have any.

Q.    How is it that you're able to live at 219 Gloucester?

A.    Because I was allowed to.

Q.    By whom?

A.    Mr. Bell.

Q.    Okay.

A.    Along with my children.

Q.    And if you did not live at 219 Gloucester, you would have to find another place to live?

A.    Exactly.

Q.    You'd have to pay rent?

A.    Exactly.

Q.    You might have to pay property taxes?

A.    If I -- if I owned something, yes.

Q.    If you owned something you'd have to pay the maintenance?

A.    It depends on if I was -- no, if I owned something, yes, I would have to pay the

maintenance.

Q. All right. You'd have to pay for property insurance?

A. I don't own anything, so...

Q. Is the residence at 219 Gloucester the only asset the Trust owns?

A. As far as I know. I don't have any access to the Trust and I haven't since 2018.

Q. Has the Trust ever owned any other assets?

A. Not that I know of, but I don't know.

Q. Does the Trust generate any income?

A. Not that I know of, but I don't know.

Q. Is anyone else living at 219 Gloucester?

A. Uh-huh.

Q. Who?

A. There's a lot of people living there.

Q. Who?

A. Currently? My oldest son, my number four son, and myself.

Q. And are any of the three of you paying rent?

A. I don't pay any rent.

Q. Do your sons?

A. I don't know.

Q.    All right.  Have you ever known of anyone paying rent to live there?

A.    As far as rent, like -- not that I know of.

Q.    You don't have a lease?

A.    Nope.

Q.    You don't have a rental agreement with the Trust?

A.    I do not.  And I could be ousted from there at any time, I'm sure.

Q.    What's the operating purpose of the Trust?

A.    What do you mean?

Q.    What's the -- what does the Trust do currently?

A.    I don't know.

Q.    It owns the house, right?

A.    As far as I know, yes.

Q.    All right.  Do you know of any other purpose for the Trust other than ownership of the house?

A.    No.

Q.    Who pays the homeowners insurance on the residence at 219 Gloucester?

A.    I don't know.

Q.  Did you ever pay the insurance?

A.  I don't remember.

Q.  Have you ever been listed as an insured on the homeowners policy for that residence?

A.  I don't know.

Q.  Why don't you know?

A.  Because, I mean, this is so long ago, I don't know.

Q.  All right, what about now?

A.  No, I don't have anything to do with any of it now.

Q.  And you're saying that's been the case since August of 2018?

A.  Exactly.

Q.  Who pays the utilities at the house?

A.  Sometimes I do, sometimes my son does, sometimes my other son does, sometimes Mr. Bell does.

Q.  Whose name are the utilities in?

A.  I think they're all still in my name.

Q.  And when did they get put in your name?

A.  Probably when the house was purchased.

Q.  When you pay the utilities, what bank account do you use to pay them?

A.  My First Tennessee, probably.

Q. Is that a checking account?

A. Uh-huh. Yes, ma'am.

Q. How long have you had that account?

A. I don't know.

Q. Ten years?

A. I have no idea. I've banked with -- it's changed names so many times, I don't know.

Q. Well, if you're talking about First Tennessee changing to First Horizon -- is that what you're referring to?

A. Yeah, I mean I've banked with First Tennessee since I lived in Memphis.

Q. Okay. When did you live in Memphis?

A. 'Til -- from 1962 to 1985.

Q. All right. Still have the same First Tennessee/First Horizon account?

A. Do I now?

Q. (Nodding head.)

A. Yes.

Q. All right. You run your business from 219 -- I'm sorry, I'm saying the address wrong, from the Gloucester residence, right?

A. I mean, if you want to call it that, yes.

Q. You do have a business, right?

A. Well, I'm a sole proprietorship, yes.

Q.   What's the name of it?

A.   Good Company.

Q.   And what is the nature of the business?

A.   I do online estate sales and consignment and I was a 1099 employee for numerous years.

Q.   For whom?

A.   Different people.  Instacart, Gopuff.

Q.   And the location of Good Company, your sole proprietorship, is the residence on Gloucester, right?

A.   Well, that's what I use as the address, correct.

Q.   Do you claim a homestead exemption in this bankruptcy?

A.   What is that?

Q.   Any exemption related to the house, the residence on Gloucester?

A.   I don't know, is that in this question? Was that in this?

Q.   No, it's not.  I'm asking.

A.   I don't know what homestead exemption is.

Q.   Are you claiming that the house should be exempt from this bankruptcy or any part of it?

A.   Oh, no, I don't have any reason to have it exempt, I don't own it.

Are you talking about these things like where it says household goods and all that?

Q. I don't know what you're looking at.

A. In this declaration.

Q. No, I'm just talking about the house itself?

A. Oh, no.

Q. You claim no property right now, right?

A. No.

Q. So you're not claiming any exemption for it either?

A. No.

Q. When the house was purchased, did you get a mortgage on it?

A. I don't know. I didn't, no.

Q. Was it purchased with -- in cash or was a loan taken out?

A. No, there was no loan that I know of.

Q. Have the beneficiaries of the Trust received accountings?

A. I don't know.

Q. Your sons are the beneficiaries, right?

A. Yeah, all my children are the beneficiaries as far as I know. I don't know if that's ever been changed.

Q.   Have they ever told you they got an accounting of what's in the Trust?

A.   I've never discussed it with them.

Q.   Do they know they're beneficiaries of this trust?

A.   I don't think they all do, no.

Q.   Why is that?

A.   I don't -- I don't recall ever -- it ever coming up in conversation except maybe with my son Charles.

Q.   Does the Trust file tax returns?

A.   I don't know.  I didn't never file a tax return for the Trust when I was a part of it because there was no need to file a tax return. To my knowledge it didn't generate any income, so therefore, it didn't have to be filing a tax return.

Q.   Where did the funds come from to purchase the residence?

A.   I don't know.

Q.   Did you provide any of the funds?

A.   I don't recall.

Q.   Did you attend the closing?

A.   I did.

Q.   Did you bring a check with you?

A.    No.

Q.    Did you --

A.    I was just told to attend the closing and sign the document as a trustee.

Q.    Okay.  Did you set up a wire to --

A.    I don't recall.

Q.    You have no recollection whatsoever about how that payment was made?

A.    No, I do not.

Q.    Okay.  And you were trustee at the time?

A.    Exactly.

Q.    So at the time the house was purchased and you were trustee, you are telling us that you don't know where the funds came from to purchase it?

A.    I do not.

Q.    You don't know what bank account it came from?

A.    I do not remember, no.

Q.    You don't know how payment was made?

A.    I -- I don't -- I didn't do all of that, I just signed the papers.

Q.    Okay.  Where do you think the money came from?

A.    Mr. Bell.

Q.   Mr. Bell being your ex-husband, Lloyd Bell?

A.   Yeah.

Q.   Do you call him Mr. Bell?

A.   Sometimes.

Q.   So you believe the money came from him?

A.   I -- I do not recall where the money came from nor do I --

Q.   Is it possible the money came from you?

A.   No.

Q.   Okay.  Did it come from you selling a property?

A.   I'm telling you, I don't remember where the money came from or how even any of the transactions happened.

Q.   How much money was it?

A.   I don't know.  I don't remember.

Q.   Okay.  We're going to remind you then.

     Who was your real estate agent for the purchase of 219 Gloucester?

A.   Who was my -- I didn't have a real estate agent, but Betsy Peebles did the real estate transaction.

Q.   How do you know Betsy?

A.   She and I are friends from college.  So

was Mr. Bell.

Q. Your name is the only name that appears on the offers and the purchase agreement for 219 Gloucester, right?

A. I don't remember. I don't have any of those records.

Q. I'm going to hand you what we'll mark Exhibit 4.

A. Okay.

(WHEREUPON, a document was marked as Exhibit Number 4.)

BY MS. BAKER:

Q. Page 1 of Exhibit 4 you see is a purchase and sale agreement, right?

A. Uh-huh.

Q. And at the top it says Meridius Trust, P. Hyde Bell, Trustee, right?

A. Correct.

Q. And that's the buyer listed in the first blank, right?

A. Yes.

Q. And that's you, correct?

A. That is me.

Q. All right. We don't see Lloyd Bell's name there, do we?

A.    No, it says Meridius Trust.

Q.    All right.  If you'll -- and it says P. Hyde Bell, right?

A.    Correct.

Q.    And --

A.    P. Hyde Bell, Trustee.

Q.    All right.  And if you flip -- you see how there's numbers on the left-hand column?

A.    Like 48 and --

Q.    Yep.

A.    Uh-huh.

Q.    Will you flip the pages until you get to 492.

A.    492.  Yes.

Q.    All right.  And that -- the buyer making the offer in the signature is Meridius Trust, P. Hyde Bell, Trustee, right?

A.    That's what it says.

Q.    That's an electronic signature, right?

A.    Yes.

Q.    All right.  And then if you'll flip two more pages to counter offer number two, you'll see at the top it's called Counter Offer Number 2.

A.    (Complies.)

Q.   You see again the buyer name is Meridius Trust, P. Hyde Bell, Trustee?

A.   Correct.

Q.   And then if you go to Line 9, it says purchase price to be $437,000?

A.   That's what it says.

Q.   All right.  And it has the signature again, Meridius Trust, P. Hyde Bell, Trustee at Line 32; is that right?

A.   That's correct.

Q.   And the date with that signature is 4/8/2018, right?

A.   That's correct.

Q.   That's two days after the Trust was created, right?

A.   I don't know.

Q.   According to the letter that is Exhibit 3 that you wrote resigning as trustee, the Trust was created on April 6, 2018, right?

A.   I don't know.  I mean, that's what the letter says, but I don't know the dates.

Q.   All right.  So the date that you signed this offer to pay $437,000 to purchase the property was 4/8/2018, right?

A.   That's what it says.

Q.    All right.  And you don't dispute that that's the date you made that offer, right?

A.    If that's what it says, that's -- I'm not disputing it.

Q.    All right.  And this offer was accepted, right?  You can see that at Line 35?

A.    Yes.  I'm not sure what your point is here.

Q.    So the amount of money that was paid to purchase this property was $437,000, right?

A.    That's what it says.

Q.    And you're telling us that you don't know where $437,000 dropped out of the air?

A.    I didn't say that I didn't know where $437,000 dropped out of the air, I do not recall where the money came from.

Q.    Okay.  I'm going to hand you what we'll make Exhibit 5.

        (WHEREUPON, a document was marked as Exhibit Number 5.)

BY MS. BAKER:

Q.    I've handed you what we've marked as Exhibit 5.  And is that your name at the top, top right, "Client/Matter, Pamela Hyde Bell, Trustee of;" do you see that?

A.    Right here?

Q.    Yes.

A.    Yes.

Q.    All right.  And this has a settlement date of 4/18/2018 at the top; do you see that?

A.    Yes.

Q.    All right.  And then do you see the section where it says "deposits"?

A.    Uh-huh.

Q.    Do you see your name with a transaction date of 4/17/2018?

A.    I see that.

Q.    All right.  And you see a column that says "cleared date"?

A.    Yes.

Q.    And under that it has cleared date 4/30/2018, right?

A.    That's what it says.

Q.    All right.  And then it has the amount that cleared of $426,880.94?

A.    That's what it says.

Q.    All right.  So this shows you depositing $426,880.94 into the escrow account for this real estate transaction, right?

A.    I don't know what it's deposited to.

Q. All right. Do you see at the top where it says "Trust Account PIN/ESCROW"?

A. Oh, yes, uh-huh.

Q. And you remember that you purchased this property as trustee of Meridius Trust for $437,000, right?

A. I do now.

Q. All right. And are you disputing that you deposited this money into the escrow for the real estate transaction?

A. I don't know how -- I'm not disputing or agreeing, I don't -- I'm just looking at what it says.

Q. And it says Pam Bell deposited $426,880.94, right?

A. That's what it says.

Q. Okay. What are the last four digits of your checking account?

A. I have no idea.

Q. Do you have your checkbook with you?

A. No.

Q. All right.

A. I don't have -- I don't have a checkbook any more.

Q. You can look it up, right?

A.    What?

Q.    The last four of your checking account?

A.    If I had -- if I had to get onto my computer, yeah.

Q.    If you'll turn to the third page of this exhibit.

A.    (Complies.)

Q.    Do you see the transfer under transfer details where it says "From: Wire in account checking *6443"?

A.    Yes, I see that.

Q.    Are those the last four of your checking account?

A.    I've no idea.

Q.    All right.  You see the amount of that wire and transfer matches the $426,880.94 that's reflected on the first page that we already talked about, right?

A.    Uh-huh.

Q.    Is that correct?

A.    Yes.

Q.    All right.  Why wasn't Lloyd Bell involved at all in this real estate transaction?

A.    He was.

Q.   Why didn't he sign any of the paperwork?

A.   I told you, he was not in town at the time.

Q.   Okay.  Who made the decision to purchase this property?

A.   He did.

Q.   Where was he when all of this went down?

A.   When all what went down?

Q.   When this real estate transaction -- you said he wasn't in town?

A.   I think he was taking care of his mother.

Q.   Okay.  I'm going to hand you what we'll make Exhibit 6.

(WHEREUPON, a document was marked as Exhibit Number 6.)

BY MS. BAKER:

Q.   Do you recognize that?

A.   No.

Q.   Take a look and follow it all the way through to the last page.

A.   (Reviews document.)

I'm not sure what you're asking me to look at, but...

Q.   I want you to look at the whole settlement statement that I've handed you and

then go to the last page where there's an acknowledgment; do you see that?

A.      Uh-huh.

Q.      Is that a yes?

A.      Yes.

Q.      All right.  And that's your signature as purchaser?

A.      Yes, Pamela H. Bell, Trustee.

Q.      And that's where you acknowledge that the settlement statement, the prior three pages is true and accurate of all receipts and disbursements made on your account or by you in this transaction, right?

A.      That's what it says.

Q.      All right.  And it was executed on the 18th day of April 2018, right?

A.      That's what it says.

Q.      And if you go back to Page 1, it lists the sale price of the property as 437,000, right?

A.      That's what it says.

Q.      And you're the buyer of it, right?

A.      The Trust is the buyer of the property.

Q.      All right.  You, as trustee, are the buyer of the property.

A. No, the Trust is the buyer of the property.

Q. Okay.

A. I signed it as trustee.

Q. I'm not trying to trick you here.

A. I don't know why you keep asking me the same question.

Q. The column says "buyer," right?

A. All right.

Q. And if you turn to the very last page, you're listed, Pamela Hyde Bell, Trustee of the Meridius Trust, you're listed as the purchaser, right?

A. I'm not disagreeing with you.

Q. All right. So that's the same as the buyer, right?

A. Whatever it says.

Q. All right. And the 437,000 was the price, but you had a deposit of $10,000, right?

A. That's what it says.

Q. Who paid the deposit?

A. I do not remember.

Q. Did you pay it?

A. I don't remember.

Q. All right. When the property was

purchased, did you get insurance through Liberty Mutual on the property?

A.    I don't remember.

Q.    I am going to hand you what we will make Exhibit 7.

(WHEREUPON, a document was marked as Exhibit Number 7.)

THE WITNESS:  Oh, this is really little, I'll need a magnifying glass.

BY MS. BAKER:

Q.    Do you need a magnifier?

A.    I'm serious.

Q.    I have found myself at the age where I use the magnifier on my phone.

A.    Oh, I didn't know there was such a thing.

Q.    Yeah, it's built in your phone.

A.    Thank you.

Q.    Here you go, see if that helps.  Can you see it better that way?

A.    Uh-huh, I see Liberty Mutual something.

Q.    All right.  What I really want you to look at is where it says the property address, which is on the left kind of towards the bottom, it says property insured.

A.    Right.

Q. 219 Gloucester, Franklin; did I read that right?

A. Yes.

Q. And then directly to the right of that where it says policyholders, it says Pam Bell and Lloyd Bell, right?

A. That's correct.

Q. All right. So does this refresh your recollection that you had Liberty Mutual homeowners insurance on the property when you purchased it?

A. Well, the top part says, "Lloyd, welcome to Liberty Mutual," so I'm assuming that it was sent to him.

Q. Okay, but I'm asking, was there Liberty Mutual insurance on the property when you purchased it?

A. I don't know the date of this, so that's why I'm saying as far as I can tell. I don't see the dates.

Q. Okay. If you --

A. Now I see, hold on. I can't see what this says.

Q. It says, if you're looking at like "next bill" --

A.    Withdrawal date, yeah.

Q.    It says withdrawn on 5/18/2018; do you see that?

A.    Okay.

Q.    And it's just showing all the other dates --

A.    Okay.

Q.    -- below.

A.    And it says, policies, Meridius Trust, right.  I'm not sure what you're asking me.

Q.    I'm asking you, does this refresh your recollection that there was Liberty Mutual insurance on the property when it was purchased?

A.    It -- it obviously was, but I didn't -- I didn't recall when the -- or who the insurance was.

Q.    Okay.  And that was with you and Lloyd as the policyholders, right?

A.    This says that Lloyd and I were policyholders.

Q.    Great.  I'll take my phone back.

A.    Sorry.

Q.    I'm going to hand you what we'll mark Exhibit 8.

(WHEREUPON, a document was marked as Exhibit Number 8.)

BY MS. BAKER:

Q. Exhibit 8 is the deed on the residence on Gloucester, right?

A. That's what it says, yeah.

Q. All right. And it has the new owner as Pamela Hyde Bell, Trustee of Meridius Trust, right?

A. That's right.

Q. And so the deed refers to Meridius Trust, right?

A. Do what?

Q. The deed refers to Meridius Trust, right?

A. Yes.

Q. It does not state anything about the Trust being revocable or irrevocable, right?

A. I didn't read through the whole thing, but...

Q. Feel free to.

A. I don't know that it would have anything to do with that.

Q. Doesn't say anything about the terms of the Trust, right?

A. The deed?

Q. Correct.

A. No.

Q. When you're done looking through it we'll have her mark it. I'm going to hand you what we'll make Exhibit 9.

(WHEREUPON, a document was marked as Exhibit Number 9.)

BY MS. BAKER:

Q. Do you recognize what I've handed you?

A. No.

Q. Ever seen this document before?

A. No.

Q. The top of the document says "Meridius Trust Certification of Trust." Did I read that correctly?

A. That's what it says, yeah.

Q. Okay. And it says that -- under paragraph A, "The name of the Trust is Meridius Trust," and "The Declaration of Trust creating such Trust was executed on April 6, 2018, and is effective as of such date;" is that correct?

A. That's what it says.

Q. Okay. And then it says, "The Grantors have set aside and hold in the Trust all interest in certain property listed on the

schedules of said Declaration of Trust, to be used for the beneficiaries named therein." Did I read that correctly?

A. Yes.

Q. It has the trustees of Pamela Hyde Bell and Lloyd Binford Bell, correct?

A. Correct.

Q. And it lists out some powers of the trustees then, right?

A. That's what -- I'm reading the same thing you are, yes.

Q. Sure. And then it cuts off and we go to the second page which it has the title of Declaration of Trust, right?

A. Uh-huh, yes.

Q. And this appears to be just a first page maybe of the actual Trust document?

A. I don't know what it is.

Q. Okay. Have you ever seen these two documents before?

A. Nope.

Q. You didn't provide them to the title company for the real estate transaction?

A. Not that I recall.

Q. Okay. So is it your testimony that these

documents are not related to Meridius Trust?

A.    I didn't say that, I said I didn't provide them to them that I recall.

Q.    Well, you told me that you reviewed the Trust and signed the Trust when it was created.

A.    Yes.

Q.    And are you telling me that these are not the Trust documents or part of them, at least?

A.    I don't know.

Q.    Okay.

A.    I don't know, I've never seen this before, so I don't know where it came from.

Q.    You agree that on the second page of this document it -- under Paragraph 1(a) it identifies you as a grantor?

A.    That's what it says.

Q.    All right.  And it also identifies Lloyd Bell as a grantor, right?

A.    That's what it says.

Q.    When you're done looking at that you can hand that to her.

      I'm going to hand you what we'll make Exhibit 10.

      (WHEREUPON, a document was marked as Exhibit Number 10.)

BY MS. BAKER:

Q. This is a declaration that you signed under penalty of perjury in the Circuit Court case in Williamson County, correct?

A. Looks like it.

Q. And that's your signature on the second page?

A. That is.

Q. And it's dated July 13, 2023, right?

A. Correct.

Q. All right. And in Paragraph 3 you say, "Meridius Trust was created in 2018 as a Revocable Living Trust," correct?

A. Correct.

Q. And you state, "I was an original grantor of that Trust as well as a trustee," correct?

A. Correct.

Q. Those two statements are correct?

A. That's what it says.

Q. All right. That's what you signed?

A. Yes, that's what I'm saying, that's what it says.

Q. All right. In Paragraph 5 you say you are not, nor have you ever been, a beneficiary of the Trust, correct?

A. Correct.

Q. And then in Paragraph 6 you say you had no beneficial ownership interest in the Trust or the house and real property located at 219 Gloucester Street, Franklin, Tennessee.

A. Right.

Q. What does that mean?

A. What it says, that I don't have any ownership in the Trust.

Q. Okay.

A. Or the house.

Q. You do benefit from the house, right?

A. I don't think I do.

Q. You get to live there, right?

A. Well, that doesn't have anything to -- I don't consider that a benefit.

Q. You're not paying rent to live there, are you?

A. Not right now.

Q. And you've never paid rent to live there.

A. I've never paid rent to someone, no.

Q. Paragraph 7 you say that when the Trust was created, no asset of any type or value, other than the house and real property, was placed in the Trust, correct?

A.    Correct.

Q.    In Paragraph 8 you say that because the Trust has no money, all the expenses have to be paid by the residents of the house, who are your family members and yourself, right?

A.    Correct.

Q.    And in Paragraph 9 you say because of your financial situation and that of your family members, you're delinquent on your property taxes for 2021 and 2022, "as we have been unable to pay those taxes in a timely fashion," correct?

A.    That's what it says.

Q.    And that's what you swore to in July of 2023, right?

A.    Correct.

Q.    And does that refresh your memory that you were paying the property taxes on 219 Gloucester until finances prevented you from doing so?

A.    It doesn't tell me anything about what I paid.  Whatever it says on here is -- yeah, that was all prepared with my attorney and it doesn't say anything about 2018 or '19 or '20, it says 2021 and 2022.  So I can't refer to the

other years.

Q.   Okay.  I'm going to go back to Exhibit 2, the bankruptcy petition and ask you a few questions.

Now, this might become tricky for us to follow because there's not really a good way to reference these documents except do you see at the very bottom where it says "Document" and then it has Page 1 of 52 on that first page?

A.   Uh-huh.

Q.   So if you follow that through, every document has a number like that.  So I'm going to refer to it that way and hopefully we can stay together on it.

A.   That's fine.

Q.   So if you can go to Page 15 of the 52.

A.   All right.

Q.   And look at the Question 25 where it says "Trusts, equitable or future interests in property other than anything listed in Line 1;" do you see that?

A.   Uh-huh.

Q.   All right.  And if you -- if you back up to Page 12 of 52 we can look at Line 1.

A.   (Complies.)

Q. Which is asking whether you have any legal or equitable interest in any residence, building, land or any similar property, and you say no, right?

A. Right.

Q. Okay. So now back to Question 25. You do mark that you have a trust, equitable or future interest in property and rights or powers exercisable for your benefit, right? You marked yes?

A. That's correct.

Q. Then it says, "Debtor is an unintended beneficiary of Meridius Trust by virtue of her ability to use, but no right to gain legal ownership of, the residential real property located at 219 Gloucester Street, Franklin, Tennessee." Did I read that correctly?

A. That's what it says.

Q. And that is your sworn statement on this petition, right?

A. Yes.

Q. And what does that mean, that you're an unintended beneficiary of the Trust?

A. You'd probably have to ask my attorney.

Q. I'm asking you because you signed it

under oath.

A.   I don't know what it means.

Q.   Okay.  Now, it says that's by virtue of your ability to use the real property located on Gloucester, right?

A.   That's what it says.

Q.   All right.  And you do have the ability to use that property, right?

A.   That's what it says.

Q.   You're living there, right?

A.   Uh-huh.  Yes.

Q.   You've lived there since it was purchased in 2018, except for the few circumstances we talked about at the beginning of this examination, right?

A.   That's what it says.

Q.   You've never been kicked out, right?

A.   I don't know about that.

Q.   What don't you know about it?

A.   I don't know that I haven't been kicked out.

Q.   Have you been kicked out?

A.   Yeah.

Q.   When?

A.   I don't remember when it was.  I've been

Q. And did you?

A. Yes.

Q. When was that?

A. I don't remember.

Q. All right. At least as of the time you filed this petition, you told the Court under penalty of perjury that you have the ability to use that property, right?

A. That's what it says.

Q. All right. And that is your interest in the property at 219 Gloucester, right?

A. The way it's written, yes.

Q. All right. Did you look at the Trust in order to give this response?

A. No.

Q. How did you come up with this?

A. My attorney did.

Q. Okay. But -- and that's just based on your memory of the Trust?

A. What do you mean?

Q. What you relay to get this response in your petition is based on just your memory of what the Trust says?

A. Whatever I talked with my attorney about.

I didn't physically write this.

Q. Okay. And I want to be careful because I can see Mr. Rusnak twitching because I don't want you to tell me what you told your --?

MR. RUSNAK: Objection, Mr. Rusnak is not twitching.

MS. BAKER: Well, I know, I'm trying to just --

MR. MEISNER: The man has a disorder, okay?

MS. BAKER: Come on, I'm trying to be respectful here and say that I can tell you think I'm attorney-client privileged, and I'm just making sure to let the witness know I'm not trying to ask anything she said to you.

MR. RUSNAK: Good lawyer and a mind reader.

THE WITNESS: Say that again.

MS. BAKER: I just want you to know I wasn't trying --

MR. MEISNER: Don't say anything to her that you spoke to Joe or I about, or Mr. Hooper for that matter.

MS. BAKER: That's my point.

MR. RUSNAK: And if you do, I will

object.  I will not twitch.

MS. BAKER:  Well, I didn't mean it colloquially, I just wanted to make sure she knew I wasn't trying to get into what you spoke to her about.

BY MS. BAKER:

Q.   All right --

A.   But you are.

Q.   No, I'm not, actually.

My question is, the responses on here are based on what you told whoever typed it up about the Trust; they're your responses, right?

A.   Sure.

Q.   And the only thing you know about the Trust is what you've told us here today, right?

A.   I've told it to you like numerous times.

Q.   Which is you don't remember anything about it, right?

A.   No, I've told you I have --

MR. RUSNAK:  Objection, are we arguing with the witness now?  I'm kind of confused and lost, frankly.

What is the question on the table.

MS. BAKER:  I'll rephrase it.

BY MS. BAKER:

Q. What you have told us today as you don't remember what the Trust document said, right?

A. I don't have a copy of the Trust document and so I don't have anything to refer to. All I can do is recall from whatever years ago it was the reason, the purpose and the fact that I'm not a beneficiary, that I am, for the third time, not a trustee and I don't have any responsibility for the Trust today or any time in the past since 2018.

Q. And my question is all of that is based on your memory because you don't -- you're claiming you don't have a copy of the document.

A. I do not have a copy of the document.

Q. So is that a yes, it is all based on your memory?

A. Yes.

Q. And when I showed you two documents that purported to be documents related to the Trust. You said you'd never seen them before.

A. I have not ever seen them before that I remember.

Q. All right. And so the statement on this petition that you have no right to gain legal

ownership of the residential real property is based on your memory, right?

A. I am not a beneficiary of Meridius Trust.

Q. That's not my question.

The statement that you have no right to gain legal ownership of the residential real property at 219 Gloucester is based on your memory.

A. Yes.

Q. All right. You can't today -- you told me you don't have a copy of the Trust, you can't produce in writing to me to tell me that that is what the Trust says, right?

A. I can't what, produce -- I can't produce --

Q. You can't produce --

A. No, I cannot produce a document that says what the Trust says.

Q. Let's look at Page 23 of 52.

A. (Complies.)

Q. All right. This is -- if you kind of look at the bottom middle, you can see it's Schedule E/F: Creditors Who Have Unsecured Claims?

A. Uh-huh.

Q. This is Page 3 of that schedule. And you're welcome to back it up a couple pages and see, starting on Page 21 is where the schedule begins.

A. (Reviews document.)

Q. Do you see that?

A. Yes, I see that.

Q. Okay. And you see, like if you're looking on Page 21, Part 1 is "Do any creditors have priority unsecured claims against you." You mark no.

Then Part 2 says "List all of your nonpriority unsecured claims." Did I read that right?

A. Wait. Oh, yes.

Q. Okay. And then it has you start to list them. Like the first one you listed is ADI Radiology, and if you carry that over to the right, it has total claim 153, right?

A. Right.

Q. So then if we get to Page 23 of 52, that's where we get to Mr. Ross's claim, right?

A. That's what it says.

Q. All right. And it says, "Christopher Ross," and then it has my name and law firm

Q. address, right?

A. Mm-hmm.

Q. And it --

A. Yes.

Q. -- has "When was the debt incurred," and you typed "pending," right?

A. Yes.

Q. And then in that far right column for the amount of the claim, or I think at the beginning, that column is identified as "total claim;" do you see that?

A. Oh, yes, unknown.

Q. All right. And so you marked that you did not know the total amount of Mr. Ross's claim, correct?

A. Correct.

Q. But you did know the total amount of his claim because you got the lawsuit that was filed in this matter, right?

A. I don't know the total amount of any claim.

Q. Okay.

A. Because there had never been a claim made that I know of.

Q. I'm going to hand you what we'll make

Exhibit 11.

(WHEREUPON, a document was marked as Exhibit Number 11.)

BY MS. BAKER:

Q.   All right, do you see that, it has -- Exhibit 11 has Mr. Ross and your name and your son's name on it, right?

A.   Uh-huh.

Q.   Is that a yes?

A.   Yes.

Q.   All right.

A.   What is this?

Q.   This is -- I'll just represent to you this is a court document, this is the second amended complaint filed in the case in the Circuit Court for Mr. Ross's claim for the car wreck.

A.   Uh-huh.

Q.   Okay.  If you'll turn to Page 4 of the document.

A.   (Complies.)

Q.   You see at the bottom where it says, "Wherefore, Plaintiff prays for the following relief"?

A.   I mean, honestly, I've never -- I don't

recall ever seeing this, but...

Q.    All right.  You see this lawsuit is seeking a judgement for compensatory damages in an amount to be determined by the trier of fact, but not to exceed $10 million, right?

A.    I see that.

Q.    Okay.  Now I'm going to hand you -- let's get this one marked, then I'm going to hand you another document.  We'll mark this Number 12.

(WHEREUPON, a document was marked as Exhibit Number 12.)

BY MS. BAKER:

Q.    These are stipulations that were entered in the Circuit Court case in Williamson County of which you were one of the Defendants.  Can you see the title of the document is Stipulations?

A.    Uh-huh.

Q.    Is that yes?

A.    Yes.

Q.    All right.

A.    I don't know what stipulations mean.

Q.    Okay.  Well, this is a stipulation that was -- that was agreed to by you through your attorney Mr. Hooper back in August of 2023.

A.    If so you say.

Q.    I will represent to you this is a court document filed in the record.  And I would like you to read silently, as I read aloud, the last sentence of that first paragraph where it says, "It is further stipulated that the treatment reflected in the medical records and the billing listed in the medical expense summary below are reasonable and necessary and causally related to the motor vehicle collision of November 11, 2020."  Did I read that correctly?

A.    Yes.

Q.    All right.  And then if you flip through to the end of that itemization, summary of treatment and charges, the total is 475,333.13, correct?

A.    Yes.

Q.    And if you flip one more page, you see that that was signed by David Hooper?

A.    Uh-huh, yes.

Q.    And he was your attorney in this case prior to Mr. Meisner, correct?

A.    Correct.

Q.    All right.

A.    And what relevance was this supposed to

be?

MR. RUSNAK: She can ask --

THE WITNESS: I just didn't know why she was showing me this. Okay.

BY MS. BAKER:

Q. I mean, you understand that that is the agreement, that $475,000 of medical bills were incurred for Mr. Ross's injuries in the collision that was part of that lawsuit?

A. Correct. What I was saying is this -- I don't know that I ever saw this piece of paper.

Q. Okay. Are any financial records kept regarding the Trust?

A. Are any what?

Q. Financial records kept regarding the Trust?

A. I don't -- I don't have access to anything about the Trust.

Q. So you don't know?

A. I have no idea.

Q. Okay. Do you know whether annual accountings are prepared?

A. I have no idea.

Q. Have you ever held meetings for the Trust?

A.    Not that I know of.

Q.    Are there any minutes for meetings of the Trust?

A.    I don't have anything to do with the Trust.  I can't tell you one more time, I do not have anything to do with this trust.  I don't have any access to any records, I don't have any control over anything.  Nor do I even know if the Trust still exists.

Q.    What is the value of the residence at 219 Gloucester?

A.    I have no idea.

Q.    Now, you put in your bankruptcy petition that it was valued at $691,200; is that right?

A.    If that's what it says.  What page is it on?

Q.    It's Page 41 of 52, Part 9, Question 23, "Do you hold or control any property that someone else owns, including any property you borrowed from or storing for or hold in trust for someone," and you marked yes; is that correct?

A.    That's what it says.

Q.    And then you listed Meridius Trust, the property at 219 Gloucester, and you valued it

at $691,200, correct?

A. That's what it says.

Q. And that's in your signed sworn petition for bankruptcy and the accompanying schedules, correct?

A. Yes.

Q. Where did you get the value?

A. Probably from Zillow.

Q. Okay. Any reason to think you got it anywhere other than Zillow?

A. No. I don't know where I came up with that. I think it was from Zillow.

Q. Okay. You didn't have an appraisal done?

A. No.

Q. All right. I'm going to hand you what we'll mark as Exhibit 13.

(WHEREUPON, a document was marked as Exhibit Number 13.)

BY MS. BAKER:

Q. Is that a Zillow listing for your house at 219 Gloucester?

A. That's what it says.

Q. Is that a picture of the house?

A. Uh-huh, yes.

Q. All right. And it has the Zillow value

Q. at 742,500; is that correct?

A. That's what it says. I don't know what date this is or anything.

Q. Is this the first time you filed bankruptcy?

A. Yes.

Q. Has Lloyd Bell ever filed bankruptcy?

A. Mr. Bell?

Q. (Nodding head.)

A. My ex-husband?

Q. Yes.

A. Yes.

Q. How many times?

A. I don't know.

Q. The -- what I've been calling the Circuit Court case is the case where Mr. Ross has sued you and your son for the collision in Williamson County, right?

A. Yes.

Q. All right. And you know that that case was set for a trial to begin on September 2nd of last year, right?

A. I'm not sure what the date was, but yes, somewhere around there.

Q. I'll refresh your memory with Exhibit 14.

(WHEREUPON, a document was marked as Exhibit Number 14.)

BY MS. BAKER:

Q. This is the order setting the case for trial signed by Judge Woodruff in Williamson County. If you can take a look at that.

Does that refresh your memory that the trial was set to begin on September 2nd and go through the 3rd and the 4th of 2025?

A. I'm not sure that I ever received this because I was sort of with an interim attorney at the time.

Q. Okay. So you're not sure you knew when the trial was going to start?

A. I don't think at this point -- I mean later, yes, when Mr. Meisner came on board.

Q. Right, I'm asking if this refreshes your memory of the date the trial was set to begin?

A. Yes.

Q. And it was set to begin September 2, 2025, right?

A. Uh-huh, yes.

Q. Okay. And you filed your bankruptcy petition on August 28, 2025, correct?

A. Whatever date it says on there.

Q.   Whatever date it says on Exhibit 2, the petition?

A.   Yes.

Q.   Okay.  And that was just days before the trial was supposed to begin, right?

A.   Obviously.

Q.   And then that resulted in the trial and the entire case in Williamson County being stayed by the judge, right?

A.   That's what I understand, yes.

Q.   Trial didn't go forward, correct?

A.   Correct.

MS. BAKER:  I want to take just a couple minutes to look through my notes and then we may be done.

(Short break.)

MS. BAKER:  I don't have any more questions right now.

THE REPORTER:  Did you want to order this?

MS. BAKER:  Yes.

THE REPORTER:  Copy?

MR. RUSNAK:  No.

FURTHER DEPONENT SAITH NOT

(At 3:11 p.m. CST.)

REPORTER'S CERTIFICATE

STATE OF TENNESSEE

COUNTY OF SUMNER

I, JENNY CHECUGA, Licensed Court Reporter, with offices in Nashville, Tennessee, and Registered Professional Reporter, hereby certify that I reported the foregoing deposition of PAMELA BELL by machine shorthand to the best of my skills and abilities, and thereafter the same was reduced to typewritten form by me.

I further certify that I am not related to any of the parties named herein, nor their counsel, and have no interest, financial or otherwise, in the outcome of the proceedings.

I further certify that in order for this document to be considered a true and correct copy, it must bear my original signature and that any unauthorized reproduction in whole or in part and/or transfer of this document is not authorized, will not be considered authentic, and will be in violation of Tennessee Code Annotated 39-14-104, Theft of Services.

JENNY CHECUGA, LCR, RPR
Checuga Reporting, Inc.
Licensed Court Reporter (TN)
Notary Public  State of Tennessee

My Notary Commission Expires:  5/18/2027
LCR #690 - Expires:  6/30/2026





*Checuga Reporting, Inc. - (615)499-9320*





*Checuga Reporting, Inc. - (615)499-9320*



*Checuga Reporting, Inc. - (615)499-9320*





*Checuga Reporting, Inc. - (615)499-9320*



*Checuga Reporting, Inc. - (615)499-9320*



*Checuga Reporting, Inc. - (615)499-9320*



*Checuga Reporting, Inc. - (615)499-9320*

**EXHIBIT 6**

AuthentiSign ID: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓



2021 RICHARD JONES ROAD
NASHVILLE, TN 37215
(615) 383-7914

## PILKERTON
### REALTORS

2 CADILLAC DRIVE
BRENTWOOD, TN 37027
(615) 371-2474

# PURCHASE AND SALE AGREEMENT

1. **Purchase and Sale.** For and in consideration of the mutual covenants herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned buyer __Meridius Trust, P Hyde Bell, Trustee__ ("Buyer") agrees to buy and the undersigned seller __Stewart Campbell Jr__ ("Seller") agrees to sell all that tract or parcel of land, with such improvements as are located thereon, described as follows: All that tract of land known as: __219 Gloucester St__ (Address) __Franklin__ (City), Tennessee, __37064__ (Zip), as recorded in __Williamson County__ County Register of Deeds Office, __6342/284__ deed book(s), _____ page(s), and/or __078L D 023.00__ instrument number and as further described as: __House and lot located at 219 Gloucester St Franklin, TN 37064__ together with all fixtures, landscaping, improvements, and appurtenances, all being hereinafter collectively referred to as the "Property."

   A. **INCLUDED** as part of the Property (if present): all attached light fixtures and bulbs including ceiling fans; permanently attached plate glass mirrors; heating, cooling, and plumbing fixtures and equipment; all doors, storm doors and windows; all window treatments (e.g., shutters, blinds, shades, curtains, draperies) and hardware; all wall-to-wall carpet; range; all built-in kitchen appliances; all bathroom fixtures and bathroom mirrors; all gas logs, fireplace doors and attached screens; all security system components and controls; garage door opener and all (at least __2__) remote controls; an entry key; swimming pool and its equipment; awnings; permanently installed outdoor cooking grills; all landscaping and all outdoor lighting; mailbox(es); attached basketball goals and backboards; TV mounting brackets (but excluding flat screen TVs); antennae and satellite dishes (excluding components); and central vacuum systems and attachments.

   B. Other items that **REMAIN** with the Property at no additional cost to Buyer:
   **Appliances**

   C. Items that **WILL NOT REMAIN** with the Property:
   **Any personal property, garbage or debris located in closets, attic, garage, or any other storage area**

   D. **LEASED ITEMS:** Leased items that remain with the Property: (e.g., security systems, water softener systems, fuel tank, etc.): _____ N/A _____. Buyer shall assume any and all lease payments as of Closing. If leases are not assumable, the balance shall be paid in full by Seller at or before Closing.

   ☒ Buyer does not wish to assume a leased item. **(THIS BOX MUST BE CHECKED IN ORDER FOR IT TO BE A PART OF THIS AGREEMENT.)**
   Buyer does not wish to assume Seller's current lease of _____ anything _____; therefore, Seller shall have said lease cancelled and leased items removed from Property prior to Closing.

   E. **FUEL:** Fuel, if any, will be adjusted and charged to Buyer and credited to Seller at Closing at current market prices.

2. **Purchase Price, Method of Payment and Closing Expenses.** Buyer warrants that, except as may be otherwise provided herein, Buyer will at Closing have sufficient cash to complete the purchase of the Property under the terms of this Purchase and Sale Agreement (hereinafter "Agreement"). The purchase price to be paid is: $__430,000.00__, __Four Hundred Thirty Thousand__ U.S. Dollars, ("Purchase Price") which shall be disbursed to Seller or Seller's Closing Agency by one of the following methods:
   i. a Federal Reserve Bank wire transfer;
   ii. a Cashier's Check issued by a financial institution as defined in 12 CFR § 229.2(i); OR
   iii. other such form as is approved in writing by Seller.

   A. **Financial Contingency – Loan(s) To Be Obtained.** This Agreement is conditioned upon Buyer's ability to obtain a loan(s) in the principal amount up to _____ % of the Purchase Price listed above to be secured by a deed of trust on the Property. "Ability to obtain" as used herein means that Buyer is qualified to receive the loan described

This form is copyrighted and may only be used in real estate transactions in which __Betsy Peebles__ is involved as a TAR authorized user. Unauthorized use of the form may result in legal sanctions being brought against the user and should be reported to the Tennessee Association of Realtors® at (615) 321-1477.

**TENNESSEE REALTORS**
Copyright 2015 © Tennessee Realtors®
RF401 – Purchase and Sale Agreement, Page 1 of 10
Version 01/01/2018

InstanetFORMS

*[Stamp: EXHIBIT P. Bell 4 2/5/26 JC — PENGAD 800-631-6989]*

Authentisign ID: ████████████████████████████

herein based upon Lender's customary and standard underwriting criteria. In consideration of Buyer, having acted in good faith and in accordance with the terms below, being unable to obtain financing by the Closing Date, the sufficiency of such consideration being hereby acknowledged, Buyer may terminate this Agreement by providing written notice via the Notification form or equivalent written notice. Seller shall have the right to request any supporting documentation regarding loan denial. Upon termination, Buyer is entitled to a refund of the Earnest Money/Trust Money. Lender is defined herein as the financial institution funding the loan.

The loan shall be of the type selected below (**Select the appropriate boxes. Unselected items will not be part of this Agreement**):

☐ Conventional Loan                    ☐ FHA Loan; attach addendum

☐ VA Loan; attach addendum        ☒ Other _____ **Cash** _____

Buyer may apply for a loan with different terms and conditions and also Close the transaction provided all other terms and conditions of this Agreement are fulfilled, and the new loan does not increase any costs charged to Seller. Buyer shall be obligated to Close this transaction if Buyer has the ability to obtain a loan with terms as described herein and/or any other loan for which Buyer has applied and been approved.

**Loan Obligations:** *The Buyer agrees and/or certifies as follows:*

(1) Within three (3) days after the Binding Agreement Date, Buyer shall make application for the loan and shall pay for credit report. Buyer shall immediately notify Seller or Seller's representative of having applied for the loan and provide Lender's name and contact information, and that Buyer has instructed Lender to order credit report. Such certifications shall be made via the Notification form or equivalent written notice;

(2) Within fourteen (14) days after the Binding Agreement Date, Buyer shall warrant and represent to Seller via the Notification form or equivalent written notice that:

    a. Buyer has secured evidence of hazard insurance which will be effective at Closing and Buyer shall notify Seller of the name of the hazard insurance company;

    b. Buyer has notified Lender of an Intent to Proceed and has available funds to Close per the signed Loan Estimate; and

    c. Buyer has requested that the appraisal be ordered and affirms that the appraisal fee has been paid.

(3) Buyer shall pursue qualification for and approval of the loan diligently and in good faith;

(4) Buyer shall continually and immediately provide requested documentation to Lender and/or loan originator;

(5) Unless otherwise stated in this Agreement, Buyer represents that this loan is not contingent upon the lease or sale of any other real property and the same shall not be used as the basis for loan denial; and

(6) Buyer shall not intentionally make any material changes in Buyer's financial condition which would adversely affect Buyer's ability to obtain the Primary Loan or any other loan referenced herein.

Should Buyer fail to timely comply with section 2.A.(1) and/or 2.A.(2) above and provide notice as required, Seller may make written demand for compliance via the Notification form or equivalent written notice. If Buyer does not furnish Seller the requested documentation within two (2) days after such demand for compliance, Buyer shall be considered in default and Seller's obligation to sell is terminated.

☒ **B.** **Financing Contingency Waived (THIS BOX MUST BE CHECKED TO BE PART OF THIS AGREEMENT.)** (e.g. "All Cash", etc.): Buyer's obligation to close shall not be subject to any financial contingency. Buyer reserves the right to obtain a loan. Buyer will furnish proof of available funds to close in the following manner: _____ **Bank Statement** _____ (e.g. bank statement, Lender's commitment letter) within five (5) days after Binding Agreement Date. Should Buyer fail to do so, Seller may make written demand for compliance via the Notification form or equivalent written notice. If Buyer does not furnish Seller with the requested notice within two (2) days after such demand for compliance, Buyer shall be considered in default and Seller's obligation to sell is terminated. Failure to Close due to lack of funds shall be considered default by Buyer.

In the event this Agreement is contingent upon an appraisal (See Paragraph 2.C. below), Buyer must order the appraisal and provide Seller with the name and telephone number of the appraisal company and proof that appraisal was ordered within five (5) days of the Binding Agreement Date. Should Buyer fail to do so, Seller may make written demand for compliance via the Notification form or equivalent written notice. If Buyer does not furnish Seller with the requested notice within two (2) days after such demand for compliance, Buyer shall be considered in default and Seller's obligation to sell is terminated.

**C.** Appraisal (**Select either 1 or 2 below. The sections not checked are not a part of this Agreement**).

    ☒ 1. This Agreement **IS NOT** contingent upon the appraised value either equaling or exceeding the agreed upon Purchase Price.

This form is copyrighted and may only be used in real estate transactions in which _____ **Betsy Peebles** _____ is involved as a TAR authorized user. Unauthorized use of the form may result in legal sanctions being brought against the user and should be reported to the Tennessee Association of Realtors® at (615) 321-1477.

TENNESSEE REALTORS   Copyright 2015 © Tennessee Realtors®
RF401 – Purchase and Sale Agreement, Page 2 of 10

Version 01/01/2018

InstanetFORMS

Authentisign ID: ██████████████████████████████████A

☐ 2. This Agreement **IS CONTINGENT** upon the appraised value either equaling or exceeding the agreed upon Purchase Price. If the appraised value is equal to or exceeds Purchase Price, this contingency is satisfied. In consideration of Buyer having conducted an appraisal, the sufficiency of such consideration being hereby acknowledged, if the appraised value of the Property does not equal or exceed the Purchase Price, Buyer shall promptly notify the Seller via the notification form or written equivalent notice. Buyer shall then have 3 days to either:

    1. waive the appraisal contingency via the notification form or equivalent written notice **OR**

    2. terminate the agreement by giving notice to seller via the notification form or equivalent written notice. Upon timely termination, Buyer is entitled to a refund of the Earnest money.

In the event buyer fails to either waive the appraisal or terminate the agreement as set forth above, this contingency shall be deemed satisfied. Thereafter, failure to appraise shall not be used as the basis for loan denial or termination of contract. Seller shall have the right to request any supporting documentation showing appraised value did not equal or exceed the agreed upon purchase price.

**D. Closing Expenses.**

1. **Seller Expenses.** Seller shall pay all existing loans and/or liens affecting the Property, including all penalties, release preparation costs, and applicable recording costs; any accrued and/or outstanding association dues or fees; fee (if any) to obtain lien payoff/estoppel letters/statement of accounts from any and all associations, property management companies, mortgage holders or other liens affecting the Property; Seller's closing fee, document preparation fee and/or attorney's fees; fee for preparation of deed; notary fee on deed; and financial institution (Bank, Credit Union, etc.) wire transfer fee or commercial courier service fee related to the disbursement of any lien payoff(s). Seller additionally agrees to permit any withholdings and/or to pay any additional sum due as is required under the Foreign Investment in Real Property Tax Act. Failure to do so will constitute a default by Seller.

   **In the event Seller is subject to Tax Withholding as required by the Foreign Investment in Real Property Tax Act, (hereinafter "FIRPTA"), Seller additionally agrees that such Tax Withholding must be collected from Seller by Buyer's Closing Agent at the time of Closing. In the event Seller is not subject to FIRPTA, Seller shall be required as a condition of Closing to sign appropriate affidavits certifying that Seller is not subject to FIRPTA.** *It is Seller's responsibility to seek independent tax advice or counsel prior to the Closing Date regarding such tax matters.*

2. **Buyer Expenses.** Buyer shall pay all transfer taxes and recording fees on deed of conveyance and deed of trust; Buyer's closing fee, document preparation fee and/or attorney's fees; preparation of note, deed of trust, and other loan documents; mortgage loan inspection or boundary line survey; credit report; required premiums for private mortgage, hazard and flood insurance; required reserved deposits for insurance premiums and taxes; prepaid interest; re-inspection fees pursuant to appraisal; insured Closing Protection Letter; association fees as stated within paragraph 4.E.; and any costs incident to obtaining and closing a loan, including but not limited to: appraisal, origination, discount points, application, commitment, underwriting, document review, courier, assignment, photo, tax service, notary fees, and any wire fee or other charge imposed for the disbursement of the Seller's proceeds according to the terms of this Agreement.

3. **Title Expenses.** Cost of title search, mortgagee's policy and owner's policy (rates to be as filed with the Tennessee Department of Commerce and Insurance) shall be paid as follows:

                                         **Seller to pay**_____.

Simultaneous issue rates shall apply.

**Not all of the above items (Seller Expenses, Buyer Expenses and Title Expenses) are applicable to every transaction and may be modified as follows:**

_____

_____

**Closing Agency for Buyer:** _____First Title and Escrow Jerry Patterson 615-383-0711_____

**Closing Agency for Seller:** _____Tbd_____

3. **Earnest Money/Trust Money.** Buyer has paid or will pay within \_\_**3**\_\_ days after the Binding Agreement Date to \_\_\_\_\_Christiansen Patterson & Courtney & Assoc\_\_\_\_\_ (name of Holder) ("Holder") located at \_\_\_\_\_4535 Harding Pike, Nashville, TN 37205\_\_\_\_\_ (address of Holder), a Earnest Money/Trust Money deposit of $\_\_**10,000.00**\_\_ by check (OR _____) ("Earnest Money/Trust Money").

A. **Failure to Receive Earnest Money/Trust Money.** In the event Earnest Money/Trust Money (if applicable) is not timely received by Holder or Earnest Money/Trust Money check or other instrument is not honored for any reason

This form is copyrighted and may only be used in real estate transactions in which _____**Betsy Peebles**_____ is involved as a TAR authorized user. Unauthorized use of the form may result in legal sanctions being brought against the user and should be reported to the Tennessee Association of Realtors® at (615) 321-1477.

**TENNESSEE REALTORS**    Copyright 2015 © Tennessee Realtors®
RF401 – Purchase and Sale Agreement, Page 3 of 10    Version 01/01/2018

InstanetFORMS

Authentisign ID: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

by the bank upon which it is drawn, Holder shall promptly notify Buyer and Seller of the Buyer's failure to deposit the agreed upon Earnest Money/Trust Money. Buyer shall then have one (1) day to deliver Earnest Money/Trust Money in immediately available funds to Holder. In the event Buyer does not deliver such funds, Buyer is in default and Seller shall have the right to terminate this Agreement by delivering to Buyer or Buyer's representative written notice via the Notification form or equivalent written notice. In the event Buyer delivers the Earnest Money/Trust Money in immediately available funds to Holder before Seller elects to terminate, Seller shall be deemed to have waived his right to terminate, and the Agreement shall remain in full force and effect.

**B. Handling of Earnest Money/Trust Money upon Receipt by Holder.** Earnest Money/Trust Money (if applicable) is to be deposited promptly after the Binding Agreement Date or the agreed upon delivery date in this Earnest Money/Trust Money paragraph or as specified in the Special Stipulations paragraph contained at paragraph 19 herein. Holder shall disburse Earnest Money/Trust Money only as follows:

    (a) at Closing to be applied as a credit toward Buyer's Purchase Price;

    (b) upon a written agreement signed by all parties having an interest in the funds;

    (c) upon order of a court or arbitrator having jurisdiction over any dispute involving the Earnest Money/Trust Money;

    (d) upon a reasonable interpretation of the Agreement; or

    (e) upon the filing of an interpleader action with payment to be made to the clerk of the court having jurisdiction over the matter.

Holder shall be reimbursed for, and may deduct from any funds interpleaded, its costs and expenses, including reasonable attorney's fees. The prevailing party in the interpleader action shall be entitled to collect from the other party the costs and expenses reimbursed to Holder. No party shall seek damages from Holder (nor shall Holder be liable for the same) for any matter arising out of or related to the performance of Holder's duties under this Earnest Money/Trust Money paragraph. Earnest Money/Trust Money shall not be disbursed prior to fourteen (14) days after deposit unless written evidence of clearance by bank is provided.

**4. Closing, Prorations, Special Assessments and Warranties Transfer.**

**A. Closing Date.** This transaction shall be closed ("Closed") (evidenced by delivery of warranty deed and payment of Purchase Price, the "Closing"), and this Agreement shall expire, at 11:59 p.m. local time on the __18__ day of _____April_____, _2018_ ("Closing Date"), or on such earlier date as may be agreed to by the parties in writing. Such expiration does not extinguish a party's right to pursue remedies in the event of default. Any extension of this date must be agreed to by the parties in writing via the Closing Date/Possession Date Amendment or equivalent written agreement.

    1. **Possession.** Possession of the Property is to be given (**Select the appropriate boxes below. Unselected items will not be part of this Agreement**):

        ☒ at Closing as evidenced by delivery of warranty deed and payment of Purchase Price;

    **OR**

        ☐ as agreed in the attached and incorporated Temporary Occupancy Agreement;

**B. Prorations.** Real estate taxes, rents, dues, maintenance fees, and association fees on said Property for the calendar year in which the sale is Closed shall be prorated as of the Closing Date. In the event of a change or reassessment of taxes for the calendar year after Closing, the parties agree to pay their recalculated share. Real estate taxes, rents, dues, maintenance fees, and association fees for prior years and roll back taxes, if any, will be paid by Seller.

**C. Special Assessments.** Special assessments approved or levied prior to the Closing Date shall be paid by the Seller at or prior to Closing unless otherwise agreed as follows: _____.

**D. Warranties Transfer.** Seller, at the option of Buyer and at Buyer's cost, agrees to transfer Seller's interest in any manufacturer's warranties, service contracts, termite bond or treatment guarantee and/or similar warranties which by their terms may be transferable to Buyer.

**E. Association Fees.** Buyer shall be responsible for all homeowner or condominium association transfer fees, related administration fees (not including statement of accounts), capital expenditures/contributions incurred due to the transfer of Property and/or like expenses which are required by the association, property management company and/or the bylaws, declarations or covenants for the Property (unless otherwise specifically addressed herein and/or unless specifically chargeable to Seller under applicable bylaws, declarations, and/or neighborhood covenants).

**5. Title and Conveyance.**

**A.** Seller warrants that at the time of Closing, Seller will convey or cause to be conveyed to Buyer or Buyer's assign(s) good and marketable title to said Property by general warranty deed, subject only to:

    (1) zoning;

This form is copyrighted and may only be used in real estate transactions in which _____**Betsy Peebles**_____ is involved as a TAR authorized user. Unauthorized use of the form may result in legal sanctions being brought against the user and should be reported to the Tennessee Association of Realtors® at (615) 321-1477.

**TENNESSEE REALTORS** Copyright 2015 © Tennessee Realtors®
RF401 – Purchase and Sale Agreement, Page 4 of 10

Version 01/01/2018

InstanetFORMS

(2) setback requirements and general utility, sewer, and drainage easements of record on the Binding Agreement Date upon which the improvements do not encroach;

(3) subdivision and/or condominium declarations, covenants, restrictions, and easements of record on the Binding Agreement Date; and

(4) leases and other encumbrances specified in this Agreement.

If title examination, closing or loan survey pursuant to Tenn. Code Ann. § 62-18-126, boundary line survey, or other information discloses material defects, Buyer may, at Buyer's discretion:

(1) accept the Property with the defects **OR**

(2) require Seller to remedy such defects prior to the Closing Date. Buyer shall provide Seller with written notice of such defects via the Notification form or equivalent written notice. If defects are not remedied prior to Closing Date, Buyer and Seller may elect to extend the Closing Date by mutual written agreement evidenced by the Closing Date/Possession Amendment form or other written equivalent. If defects are not remedied by the Closing Date or any mutually agreed upon extension thereof, this Agreement shall terminate, and Buyer shall be entitled to refund of Earnest Money/Trust Money.

Good and marketable title as used herein shall mean title which a title insurance company licensed to do business in Tennessee will insure at its regular rates, subject only to standard exceptions. The title search or abstract used for the purpose of evidencing good and marketable title must be acceptable to the title insurance agent and the issuing title insurance company. Seller agrees to execute such appropriate affidavits and instruments as may be required by the issuing title insurance company.

B. **Deed.** Deed is to be made in the name of _____ **TBD** _____.
The manner in which Buyer takes title determines ownership and survivorship rights. It is the Buyer's responsibility to consult the closing agency or attorney prior to Closing.

6. **Lead-Based Paint Disclosure (Select the appropriate box. Items not selected are not part of this Agreement).**
   ✗ does not apply.   ☐ does apply (Property built prior to 1978).

7. **Inspections.**
   A. **Buyer's Right to Make Inspection(s). All inspections/reports, including but not limited to the home inspection report, those required/recommended in the home inspection report, Wood Destroying Insect Infestation Inspection Report, septic inspection and well water test, are to be made at Buyer's expense, unless otherwise stipulated in this Agreement.** The parties hereto agree that in the event Buyer shall elect to contract with a third party inspector to obtain a "Home Inspection" as defined by Tennessee law, said inspection shall be conducted by a licensed Home Inspector. However, nothing in this paragraph shall preclude Buyer from conducting any inspections on his/her own behalf, nor shall it preclude Buyer from retaining a qualified (and if required by law, licensed) professional to conduct inspections of particular systems or issues within such professional's expertise or licensure, including but not limited to inspection of the heating/cooling systems, electrical systems, foundation, etc., so long as said professional is not in violation of Tenn. Code Ann. § 62-6-301, et seq. as may be amended. **Seller shall cause all utility services and any pool, spa, and similar items to be operational so that Buyer may complete all inspections and tests under this Agreement.** Buyer agrees to indemnify Seller from the acts of himself, his inspectors and/or representatives in exercising his rights under this Purchase and Sale Agreement. Buyer's obligations to indemnify Seller shall also survive the termination of this Agreement by either party, which shall remain enforceable. **Buyer waives any objections to matters of purely cosmetic nature (e.g. decorative, color or finish items) disclosed by inspection. Buyer has no right to require repairs or alterations purely to meet current building codes, unless required to do so by governmental authorities.**

   B. **Initial Inspections.** Buyer and/or his inspectors/representatives shall have the right and responsibility to enter the Property during normal business hours, for the purpose of making inspections and/or tests of the Property. Buyer and/or his inspectors/representatives shall have the right to perform a visual analysis of the condition of the Property, any reasonably accessible installed components, the operation of the Property's systems, including any controls normally operated by Seller including the following components: heating systems, cooling systems, electrical systems, plumbing systems, structural components, foundations, roof coverings, exterior and interior components, any other site aspects that affect the Property, and environmental issues.

   C. **Wood Destroying Insect Infestation Inspection Report.** If desired by Buyer or required by Buyer's Lender, it shall be Buyer's responsibility to obtain *at Buyer's expense* a Wood Destroying Insect Infestation Inspection Report (the "Report"), which shall be made by a Tennessee licensed and chartered pest control operator.

   **The foregoing expense may be subject to governmental guidelines relating to VA Loans (See VA/FHA Loan Addendum if applicable).**

This form is copyrighted and may only be used in real estate transactions in which _____ **Betsy Peebles** _____ is involved as a TAR authorized user. Unauthorized use of the form may result in legal sanctions being brought against the user and should be reported to the Tennessee Association of Realtors® at (615) 321-1477.

TENNESSEE REALTORS   Copyright 2015 © Tennessee Realtors®   RF401 – Purchase and Sale Agreement, Page 5 of 10   Version 01/01/2018

InstanetFORMS

The inspection shall include each dwelling, garage, and other permanent structure on the Property excluding _____**nothing**_____ for evidence of active infestation and/or damage. Buyer shall cause such Report to be delivered to Seller simultaneously with any repairs requested by the Buyer or the end of the Inspection Period, whichever is earlier. If the Report indicates evidence of active infestation, Seller agrees to treat infestation at Seller's expense and provide documentation of the treatment to Buyer prior to Closing. Requests for repair of damage, if any, should be addressed in the Buyer's request for repairs pursuant to Subparagraph 8.D., Buyer's Inspection and Resolution below.

D. **Buyer's Inspection and Resolution.** Within ___7___ days after the Binding Agreement Date ("Inspection Period"), Buyer shall cause to be conducted any inspection provided for herein, including but not limited to the Wood Destroying Insect Infestation Inspection Report AND shall provide written notice of such to Seller as described below. *In the event Buyer fails to timely make such inspections and respond within said timeframe as described herein, the Buyer shall have forfeited any rights provided under this Section 7, and in such case shall accept the Property in its current condition, normal wear and tear excepted.*

**In said notice Buyer shall either:**

(1) In consideration of Buyer having conducted Buyer's good faith inspections as provided for herein, the sufficiency of such consideration being hereby acknowledged, Buyer shall furnish Seller with a list of written specified objections and immediately terminate this Agreement via the Notification form or equivalent written notice. All Earnest Money/Trust Money shall be returned to Buyer upon termination.

**OR**

(2) accept the Property in its present "AS IS" condition with any and all faults and no warranties expressed or implied via the Notification form or equivalent written notice. Seller has no obligation to make repairs.

**OR**

(3) furnish Seller a written list of items which Buyer requires to be repaired and/or replaced with like quality or value in a professional and workmanlike manner. Seller shall have the right to request any supporting documentation that substantiates any item listed.

    a. Resolution Period. Seller and Buyer shall then have a period of ___2___ days following receipt of the above stated written list ("Resolution Period") to reach a mutual agreement as to the items to be repaired or replaced with like quality or value by Seller, which shall be evidenced by the Repair / Replacement Amendment or written equivalent(s). *The parties agree to negotiate repairs in good faith during the Resolution Period.* In the event Seller and Buyer do not reach a mutual written resolution during such Resolution Period or a mutually agreeable written extension thereof as evidenced in an Amendment to this Agreement signed by both parties within said period of time, this Agreement is hereby terminated. If terminated, Buyer is entitled to a refund of the Earnest Money/Trust Money.

☐ E. **Waiver of All Inspections. THIS BOX MUST BE CHECKED TO BE PART OF THIS AGREEMENT.** Buyer, having been advised of the benefits of inspections, waives any and all Inspection Rights under this Section 7 (including but not limited to the Wood Destroying Insect Infestation Inspection Report).

8. **Final Inspection.** Buyer and/or his inspectors/representatives shall have the right to conduct a final inspection of Property on the Closing Date or within ___0___ day(s) prior to the Closing Date only to confirm Property is in the same or better condition as it was on the Binding Agreement Date, normal wear and tear excepted, and to determine that all repairs/replacements agreed to during the Resolution Period, if any, have been completed. Property shall remain in such condition until Closing at Seller's expense. Closing of this sale constitutes acceptance of Property in its condition as of the time of Closing, unless otherwise noted in writing.

9. **Buyer's Additional Due Diligence Options.** If any of the matters below are of concern to Buyer, Buyer should address the concern by specific contingency in the Special Stipulations Paragraph of this Agreement.

A. **Survey and Flood Certification.** Survey Work and Flood Certifications are the best means of identifying boundary lines and/or encroachments and easements or flood zone classifications. Buyer may obtain a Mortgage Inspection or Boundary Line Survey and Flood Zone Certifications.

B. **Insurability.** Many different issues can affect the insurability and the rates of insurance for property. These include factors such as changes in the Flood Zone Certifications, changes to the earthquake zones maps, the insurability of the buyer, and previous claims made on the Property. It is the right and responsibility of Buyer to determine the insurability, coverage and the cost of insuring the Property. It is also the responsibility of Buyer to determine whether any exclusions will apply to the insurability of said Property.

This form is copyrighted and may only be used in real estate transactions in which _____ **Betsy Peebles** _____ is involved as a TAR authorized user. Unauthorized use of the form may result in legal sanctions being brought against the user and should be reported to the Tennessee Association of Realtors® at (615) 321-1477.

**TENNESSEE REALTORS**
Copyright 2015 © Tennessee Realtors®
RF401 – Purchase and Sale Agreement, Page 6 of 10

Version 01/01/2018

InstanetFORMS

Authentisign ID: ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛A

C. **Water Supply.** The system may or may not meet state and local requirements. It is the right and responsibility of Buyer to determine the compliance of the system with state and local requirements. [For additional information on this subject, request the "Water Supply and Waste Disposal Notification" form.]

D. **Waste Disposal.** The system may or may not meet state and local requirements. It is the right and responsibility of Buyer to determine the compliance of the system with state and local requirements. In addition, Buyer may, for a fee, obtain a septic system inspection letter from the Tennessee Department of Environment and Conservation, Division of Ground Water Protection. [For additional information on this subject, request the "Water Supply and Waste Disposal Notification" form.]

E. **Title Exceptions.** At Closing, the general warranty deed will be subject to subdivision and/or condominium declarations, covenants, restrictions and easements of record, which may impose obligations and may limit the use of the Property by Buyer.

10. **Disclaimer.** It is understood and agreed that the real estate firms and real estate licensee(s) representing or assisting Seller and/or Buyer and their brokers (collectively referred to as "Brokers") are not parties to this Agreement and do not have or assume liability for the performance or nonperformance of Seller or Buyer. Buyer and Seller agree that Brokers shall not be responsible for any of the following, including but not limited to, those matters which could have been revealed through a survey, flood certification, title search or inspection of the Property; the insurability of the Property or cost to insure the Property; for the condition of the Property, any portion thereof, or any item therein; for any geological issues present on the Property; for any issues arising out of the failure to physically inspect Property prior to entering into this Agreement and/or Closing; for the necessity or cost of any repairs to the Property; for hazardous or toxic materials; for the tax or legal consequences of this transaction; for the availability, capability, and/or cost of utility, sewer, septic, or community amenities; for any proposed or pending condemnation actions involving Property; for applicable boundaries of school districts or other school information; for the appraised or future value of the Property; for square footage or acreage of the Property; for any condition(s) existing off the Property which may affect the Property; for the terms, conditions, and availability of financing; and/or for the uses and zoning of the Property whether permitted or proposed. Buyer and Seller acknowledge that Brokers are not experts with respect to the above matters and that they have not relied upon any advice, representations or statements of Brokers (including their firms and affiliated licensees) and waive and shall not assert any claims against Brokers (including their firms and affiliated licensees) involving same. Buyer and Seller understand that it has been strongly recommended that if any of these or any other matters concerning the Property are of concern to them, that they secure the services of appropriately credentialed experts and professionals of Buyer's or Seller's choice for the independent expert advice and counsel relative thereto.

11. **Brokerage.** As specified by separate agreement, Seller agrees to pay Listing Broker at Closing the agreed upon compensation. The Listing Broker will direct the closing agency to pay the Selling Broker, from the compensation received, an amount in accordance with the terms and provisions specified by separate agreement. The parties agree and acknowledge that the Brokers involved in this transaction may receive compensation from more than one party. All parties to this Agreement agree and acknowledge that any real estate firm involved in this transaction shall be deemed a third party beneficiary only for the purposes of enforcing their commission rights, and as such, shall have the right to maintain an action on this Agreement for any and all compensations due and any reasonable attorney's fees and court costs.

12. **Default.** Should Buyer default hereunder, the Earnest Money/Trust Money shall be forfeited as damages to Seller and shall be applied as a credit against Seller's damages. Seller may elect to sue, in contract or tort, for additional damages or specific performance of the Agreement, or both. Should Seller default, Buyer's Earnest Money/Trust Money shall be refunded to Buyer. In addition, Buyer may elect to sue, in contract or tort, for damages or specific performance of this Agreement, or both. In the event that any party hereto shall file suit for breach or enforcement of this Agreement (including suits filed after Closing which are based on or related to the Agreement), the prevailing party shall be entitled to recover all costs of such enforcement, including reasonable attorney's fees. In the event that any party exercises its right to terminate due to the default of the other pursuant to the terms of this Agreement, the terminating party retains the right to pursue any and all legal rights and remedies against the defaulting party following termination. The parties hereby agree that all remedies are fair and equitable and neither party will assert the lack of mutuality of remedies, rights and/or obligations as a defense in the event of a dispute.

13. **Home Protection Plan.** This is not a substitution for Home Inspection. Exclusions to coverage may apply. (Select the appropriate box below. Items not selected are not part of this Agreement).

✗ **Home Protection Plan.** _____ to pay $_____ for the purchase of a limited home protection plan to be funded at Closing. Plan Provider: _____.

Ordered by: _____ (Real Estate Company)

This form is copyrighted and may only be used in real estate transactions in which _____ **Betsy Peebles** _____ is involved as a TAR authorized user. Unauthorized use of the form may result in legal sanctions being brought against the user and should be reported to the Tennessee Association of Realtors® at (615) 321-1477.

TENNESSEE REALTORS   Copyright 2015 © Tennessee Realtors®
RF401 – Purchase and Sale Agreement, Page 7 of 10

Version 01/01/2018

InstanetFORMS

☐ Home Protection Plan waived.

**14. Other Provisions.**

A. **Binding Effect, Entire Agreement, Modification, Assignment, and Binding Agreement Date.** This Agreement shall be for the benefit of, and be binding upon, the parties hereto, their heirs, successors, legal representatives and assigns. This Agreement constitutes the sole and entire agreement between the parties hereto and no modification of this Agreement shall be binding unless signed by all parties or assigns to this Agreement. No representation, promise, or inducement not included in this Agreement shall be binding upon any party hereto. It is hereby agreed by both Buyer and Seller that any real estate agent working with or representing either party shall not have the authority to bind the Buyer, Seller or any assignee to any contractual agreement unless specifically authorized in writing within this Agreement. Any assignee shall fulfill all the terms and conditions of this Agreement. The parties hereby authorize either licensee to insert the time and date of receipt of the notice of acceptance of the final offer and further agree to be bound by such as the Binding Agreement Date following the signatory section of this Agreement, or Counter Offer, if applicable.

B. **Survival Clause.** Any provision contained herein, which by its nature and effect is required to be performed after Closing, shall survive the Closing and delivery of the deed and shall remain binding upon the parties to this Agreement and shall be fully enforceable thereafter.

C. **Governing Law and Venue.** This Agreement is intended as a contract for the purchase and sale of real property and shall be governed by and interpreted in accordance with the laws and in the courts of the State of Tennessee.

D. **Time of Essence.** Time is of the essence in this Agreement.

E. **Terminology.** As the context may require in this Agreement: (1) the singular shall mean the plural and vice versa; (2) all pronouns shall mean and include the person, entity, firm or corporation to which they relate; (3) the masculine shall mean the feminine and vice versa; and (4) the term day(s) used throughout this Agreement shall be deemed to be calendar day(s) ending at 11:59 p.m. local time unless otherwise specified in this Agreement. Local time shall be determined by the location of Property. **In the event a performance deadline**, other than the Closing Date (as defined in paragraph 4 herein), Date of Possession (as defined in paragraph 4 herein), Completion of Repair Deadline (as defined in the Repair/Replacement Amendment), and Offer Expiration Date (as defined in paragraph 20 herein), occurs on a Saturday, Sunday or legal holiday, the performance deadline shall extend to the next following business day. Holidays as used herein are those days deemed federal holidays pursuant to 5 U.S.C. § 6103. In calculating any time period under this Agreement, the commencement shall be the day following the initial date (e.g. Binding Agreement Date).

F. **Responsibility to Cooperate.** Buyer and Seller agree to timely take such actions and produce, execute, and/or deliver such information and documentation as is reasonably necessary to carry out the responsibilities and obligations of this Agreement. Except as to matters which are occasioned by clerical errors or omissions or erroneous information, the approval of the closing documents by the parties shall constitute their approval of any differences between this Agreement and the Closing. Buyer and Seller agree that if requested after Closing, they will correct any documents and pay any amounts due where such corrections or payments are appropriate by reason of mistake, clerical errors or omissions, or the result of erroneous information.

G. **Notices.** Except as otherwise provided herein, all notices and demands required or permitted hereunder shall be in writing and delivered either (1) in person; (2) by a prepaid overnight delivery service; (3) by facsimile transmission (FAX); (4) by the United States Postal Service, postage prepaid, registered or certified, return receipt requested; or (5) Email. **NOTICE** shall be deemed to have been given as of the date and time it is actually received. Receipt of notice by the real estate licensee or their Broker assisting a party as a client or customer shall be deemed to be notice to that party for all purposes under this Agreement as may be amended, unless otherwise provided in writing.

H. **Risk of Loss.** The risk of hazard or casualty loss or damage to Property shall be borne by the Seller until transfer of title. If casualty loss prior to Closing exceeds 10% of the Purchase Price, Seller or Buyer may elect to terminate this Agreement with a refund of Earnest Money/Trust Money to Buyer.

I. **Equal Housing.** This Property is being sold without regard to race, color, sex, religion, handicap, familial status, or national origin.

J. **Severability.** If any portion or provision of this Agreement is held or adjudicated to be invalid or unenforceable for any reason, each such portion or provision shall be severed from the remaining portions or provisions of this Agreement, and the remaining portions or provisions shall be unaffected and remain in full force and effect. In the

This form is copyrighted and may only be used in real estate transactions in which _____**Betsy Peebles**_____ is involved as a TAR authorized user. Unauthorized use of the form may result in legal sanctions being brought against the user and should be reported to the Tennessee Association of Realtors® at (615) 321-1477.

Authentisign ID: ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

event that the contract fails due to the severed provisions, then the offending language shall be amended to be in conformity with state and federal law.

K. **Contract Construction.** This Agreement or any uncertainty or ambiguity herein shall not be construed against any party but shall be construed as if all parties to this Agreement jointly prepared this Agreement.

L. **Section Headings.** The Section Headings as used herein are for reference only and shall not be deemed to vary the content of this Agreement or limit the scope of any Section.

15. **Seller's Additional Obligations.** If Seller has any knowledge of an exterior injection well, a sinkhole as defined pursuant to Tenn. Code Ann. § 66-5-212(c), and/or a percolation test or soil absorption rate on the Property, Seller shall be obligated to counter this offer by disclosure of the existence of the above including any tests and reports unless disclosure has already been received and acknowledged in writing by Buyer. Seller shall also disclose in the same manner whether any single family residence located on the Property has been moved from an existing foundation to another foundation where such information is known to the Seller. Seller shall also be obligated to counter this offer to disclose if the Property is located in a Planned Unit Development (PUD) as defined pursuant to Tenn. Code Ann. § 66-5-213 unless said disclosure has already been received in writing and acknowledged by Buyer. If the Property is in a PUD, Seller agrees to make available copies of the development's restrictive covenants, homeowner bylaws, and master deed to Buyer upon request.

16. **Method of Execution.** The parties agree that signatures and initials transmitted by facsimile, other photocopy transmittal, or by transmittal of digital signature as defined by the applicable State or Federal law will be acceptable and may be treated as originals and that the final Purchase and Sale Agreement containing all signatures and initials may be executed partially by original signature and partially on facsimile, other photocopy documents, or by digital signature as defined by the applicable State or Federal law.

17. **Exhibits and Addenda.** All exhibits and/or addenda attached hereto, listed below, or referenced herein are made a part of this Agreement:

18. **Special Stipulations.** The following Special Stipulations, if conflicting with any preceding paragraph, shall control:

This form is copyrighted and may only be used in real estate transactions in which _____ **Betsy Peebles** _____ is involved as a TAR authorized user. Unauthorized use of the form may result in legal sanctions being brought against the user and should be reported to the Tennessee Association of Realtors® at (615) 321-1477.

**TENNESSEE REALTORS**   Copyright 2015 © Tennessee Realtors®   RF401 – Purchase and Sale Agreement, Page 9 of 10   Version 01/01/2018

InstanetFORMS

Authentisign ID: ▨▨▨▨▨▨▨▨-▨▨▨▨-▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨A

**19. Time Limit of Offer.** This Offer may be withdrawn at any time before acceptance with Notice. Offer terminates if not countered or accepted by ___12:00___ o'clock ☐ a.m./ ☒ p.m.; on the ___8th___ day of ___April___, ___2018___.

**LEGAL DOCUMENTS:** This is an important legal document creating valuable rights and obligations. If you have any questions about it, you should review it with your attorney. Neither the Broker nor any Agent or Facilitator is authorized or qualified to give you any advice about the advisability or legal effect of its provisions.

**NOTE:** Any provisions of this Agreement which are preceded by a box "☐" must be marked to be a part of this Agreement. By affixing your signature below, you also acknowledge that you have reviewed each page and have received a copy of this Agreement.

**IMPORTANT NOTICE:** Never trust wiring instructions sent via email. Cyber criminals are hacking email accounts and sending emails with fake wiring instructions. These emails are convincing and sophisticated. Always independently confirm wiring instructions in person or via a telephone call to a trusted and verified phone number. Never wire money without double-checking that the wiring instructions are correct.

Buyer hereby makes this offer.

*Meridius Trust, P Hyde Bell, Trustee*

BUYER Meridius Trust, P Hyde Bell, Trustee          BUYER _____

___04/07/2018___ at _____ o'clock ☐ am/ ☐ pm          _____ at _____ o'clock ☐ am/ ☐ pm
**Offer Date**          **Offer Date**

Seller hereby:

☐ **ACCEPTS** – accepts this offer.

☒ **COUNTERS** – accepts this offer subject to the attached Counter Offer(s).

☐ **REJECTS** this offer and makes no counter offer.

*Stewart Campbell Junior*          *Sharon L. Campbell*
4/7/2018 ... PM CDT          4/7/2018 5:48:50 PM CDT
SELLER          SELLER

04/07/2018          04/07/2018
_____ at _____ o'clock ☐ am/ ☐ pm          _____ at _____ o'clock ☐ am/ ☐ pm
**Date**          **Date**

**Binding Agreement Date.** This instrument shall become a "Binding Agreement" on the date ("Binding Agreement Date") the last offeror, or licensee of the offeror, receives notice of offeree's acceptance.

Notice of acceptance of the final offer was received by _____ on _____ at _____ o'clock ☐ am/ ☐ pm

**For Information Purposes Only:**

Listing Company: Christianson, Patterson, Courtney & Associates          Selling Company: Pilkerton REALTORS

Listing Firm Address: 4535 Harding Rd #110          Selling Firm Address: 2021 Richard Jones Rd, Ste 210

Firm License No.: 262119          Firm License No.: 246625

Firm Telephone No.: 615-202-7777          Firm Telephone No.: 615-383-7914

Listing Licensee: Laura Roberts Clay          Selling Licensee: Betsy Peebles

Licensee License Number: 331003          Licensee License Number: 313195

Licensee Email: laurarobertsclay@gmail.com          Licensee Email: betsypeebles@gmail.com

Home Owner's / Condominium Association ("HOA/COA"):

HOA / COA Phone: _____          HOA/COA Email: _____

Property Management Company: _____

Phone: _____          Email: _____

*NOTE: This form is provided by TAR to its members for their use in real estate transactions and is to be used as is. By downloading and/or using this form, you agree and covenant not to alter, amend, or edit said form or its contents except as where provided in the blank fields, and agree and acknowledge that any such alteration, amendment or edit of said form is done at your own risk. Use of the TAR logo in conjunction with any form other than standardized forms created by TAR is strictly prohibited. This form is subject to periodic revision and it is the responsibility of the member to use the most recent available form.*

This form is copyrighted and may only be used in real estate transactions in which ___Betsy Peebles___ is involved as a TAR authorized user. Unauthorized use of the form may result in legal sanctions being brought against the user and should be reported to the Tennessee Association of Realtors® at (615) 321-1477.

TENNESSEE REALTORS          Copyright 2015 © Tennessee Realtors®          Version 01/01/2018
RF401 – Purchase and Sale Agreement, Page 10 of 10

InstanetFORMS

AuthentiSign ID: ••••••••-••••-••••••••••••••••••••••A



CHRISTIANSON
PATTERSON
COURTNEY
ASSOCIATES

# COUNTER OFFER # ___1___

This is a Counter Offer from   ✗ Seller to Buyer   OR   ☐ Buyer to Seller

Seller Name: ___Stewart Campbell Junior___   Seller Name: ___Shanan L. Campbell___

Buyer Name: ___Meridus Trust, P Hyde Bell, Trustee___   Buyer Name: _____

The undersigned agree to and accept the Purchase and Sale Agreement with an offer date of ___04/07/2018___ for the purchase of real property commonly known as:

___219   Gloucester Street_____   Franklin    TN   37064

Address, City, State, Zip

With the following exceptions:

Line 4 Stewart Campbell Junior and Shanan L. Campbell ("Seller")

Line 41 Purchase Price to be $439,000 (Four Hundred Thirty-Nine Thousand)

Line 152 Mid-State Title & Escrow Inc. to close for Sellers. Jim Oglesby; (615) 550-2800

Line 373 Seller to pay $540 for the purchase of a limited home protection plan to be funded at Closing. Plan Provider is 2-10 Home Buyers Warranty and will be ordered by Christianson Patterson Courtney & Associates.

ALL OTHER TERMS AND CONDITIONS OF THE ORIGINAL ATTACHED PURCHASE AND SALE AGREEMENT ARE ACCEPTABLE TO THE UNDERSIGNED. ALL TERMS AND CONDITIONS PROPOSED IN PREVIOUS COUNTER OFFERS, IF ANY, ARE NOT INCLUDED IN THIS COUNTER OFFER UNLESS RESTATED HEREIN.

This Counter Offer form will not be a part of the Purchase and Sale Agreement and be binding until accepted and signed by all parties.

_Until notice of acceptance is delivered_ the subject Property is still on the market for sale, and this offer may be revoked at any time with notice, and the Property may be sold to any other party.

Time Limit of Offer: This Offer may be withdrawn at any time before acceptance with notice. Offer terminates if not accepted by ___10___ o'clock ✗ am/ ☐ pm, local time, on the ___8th___ day of _____April_____, ___2018___.

| | |
|---|---|
| _Stewart Campbell Junior_    04/07/2018 | _Shanan L Campbell_    04/07/2018 |
| Seller/Buyer _(Party making counter offer)_ DATE | Seller/Buyer _(Party making counter offer)_ DATE |

The undersigned has received and
   ☐   ACCEPTED this offer
   ☐   REJECTED this offer
   ✗   COUNTERED this offer with Counter Offer # ___2___

At ___6:45___ o'clock ✗ am/ ☐ pm; this ___8th___ day of _____April_____, ___2018___.

_Meridius Trust, P Hyde Bell, Trustee_ _____

Seller/Buyer _(Responding Party)_     Seller/Buyer _(Responding Party)_

Binding Agreement Date. This instrument shall become a "Binding Agreement" on the date ("Binding Agreement Date") the last offeror, or licensee of offeror, receives notice of offeree's acceptance. Notice of acceptance of the final offer was received by _____ on _____ at _____ o'clock ☐ am/ ☐ pm

NOTE: This form is provided by TAR to its members for their use in real estate transactions and is to be used as is. By downloading and/or using this form, you agree and covenant not to alter, amend, or edit said form or its contents except as where provided in the blank fields, and agree and acknowledge that any such alteration, amendment or edit of said form is done at your own risk. Use of the TAR logo in conjunction with any form other than standardized forms created by TAR is strictly prohibited. This form is subject to periodic revision and it is the responsibility of the member to use the most recent available form.

This form is copyrighted and may only be used in real estate transactions in which _____Laura Clay_____ is involved as a TAR authorized user. Unauthorized use of the form may result in legal sanctions being brought against the user and should be reported to the Tennessee Association of Realtors® at (615) 321-1477.

TENNESSEE REALTORS    Copyright 2010 © Tennessee Realtors®    RF651 – Counter Offer, Page 1 of 1      Version 01/01/2018

InstanetFORMS

Authentisign ID: ░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░



2021 RICHARD JONES ROAD
NASHVILLE, TN 37215
(615) 383-7914

**PILKERTON**
R E A L T O R S

2 CADILLAC DRIVE
BRENTWOOD, TN 37027
(615) 371-2474

## COUNTER OFFER # ___2___

This is a Counter Offer from ☐ Seller to Buyer  OR  ☒ Buyer to Seller

Seller Name: _____Stewart Campbell Jr_____  Seller Name: _____Shanan  L. Campbell_____

Buyer Name: Meridius Trust,P.Hyde Bell, Trustee  Buyer Name: _____

The undersigned agree to and accept the Purchase and Sale Agreement with an offer date of ___4/3/2018___ for the purchase of real property commonly known as:

219   Gloucester St _____ Franklin ___ TN ___ 37064
Address, City, State, Zip

With the following exceptions:

**Purchase price to be $437,000.00**

**Stewart Campbell, Jr and Shanan L. Campbell (seller)**

**Mid-State Title & Escrow to close for the seller.  Jim Oglesby 615-550-2800**

**Seller to pay $540.00 for the purchase of a limited protection Home Waranty to be funded at closing.  Plan provider is 2-10 Home Warranty and will be ordered by Christiansen, Patterson, Courtney.**

ALL OTHER TERMS AND CONDITIONS OF THE ORIGINAL ATTACHED PURCHASE AND SALE AGREEMENT ARE ACCEPTABLE TO THE UNDERSIGNED. ALL TERMS AND CONDITIONS PROPOSED IN PREVIOUS COUNTER OFFERS, IF ANY, ARE NOT INCLUDED IN THIS COUNTER OFFER UNLESS RESTATED HEREIN.

This Counter Offer form will not be a part of the Purchase and Sale Agreement and be binding until accepted and signed by all parties.

*Until notice of acceptance is delivered* the subject Property is still on the market for sale, and this offer may be revoked at any time with notice, and the Property may be sold to any other party.

Time Limit of Offer: This Offer may be withdrawn at any time before acceptance with notice.  Offer terminates if not accepted by ___12:00___ o'clock ☐ am/☒ pm, local time, on the ___8th___ day of _____April_____, ___2018___.

| *Meridieu Trust, P Hyde Bell, Trustee*  04/08/2018 | |
|---|---|
| Seller/Buyer *(Party making counter offer) DATE* | Seller/Buyer *(Party making counter offer) DATE* |

The undersigned has received and
☒ ACCEPTED this offer
☐ REJECTED this offer
☐ COUNTERED this offer with Counter Offer # _____

At _____ o'clock ☐ am/☐ pm; this _____ day of _____

| *Stewart Campbell Junior*  4/8/2018 10:01:05 AM CDT | *Shanan L. Campbell*  4/8/2018 10:00:21 AM CDT |
|---|---|
| Seller/Buyer *(Responding Party)* | Seller/Buyer *(Responding Party)* |

Binding Agreement Date. This instrument shall become a "Binding Agreement" on the date ("Binding Agreement Date") the last offeror, or licensee of offeror, receives notice of offeree's acceptance. Notice of acceptance of the final offer was received by _____ on ___4/8/18___ at ___10.05___ o'clock ☒ am/☐ pm

NOTE: This form is provided by TAR to its members for their use in real estate transactions and is to be used as is. By downloading and/or using this form, you agree and covenant not to alter, amend, or edit said form or its contents except as where provided in the blank fields, and agree and acknowledge that any such alteration, amendment or edit of said form is done at your own risk. Use of the TAR logo in conjunction with any form other than standardized forms created by TAR is strictly prohibited. This form is subject to periodic revision and it is the responsibility of the member to use the most recent available form.

This form is copyrighted and may only be used in real estate transactions in which _____Betsy Peebles_____ is involved as a TAR authorized user. Unauthorized use of the form may result in legal sanctions being brought against the user and should be reported to the Tennessee Association of Realtors® at (615) 321-1477.

TENNESSEE
REALTORS
Copyright 2010 © Tennessee Realtors®
RF651 – Counter Offer, Page 1 of 1

Version 01/01/2018

InstanetFORMS

Authentisign ID: 61X5A6BG9D9FC4D7G543535809C5F56F66C44



CHRISTIANSON
PATTERSON
COURTNEY
& ASSOCIATES

# REPAIR / REPLACEMENT AMENDMENT

In consideration of the mutual covenants herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties enter into this Repair / Replacement Amendment for purposes of amending the Purchase and Sale Agreement with a Binding Agreement Date of _____04/08/2018_____ ("Agreement") for the purchase and sale of the real property commonly known as:

219  Gloucester Street                          Franklin          TN      37064

The Seller shall cause the following items to be replaced or repaired with like quality or value in a professional and workmanlike manner as the parties hereinafter agree. (Please be specific as to whether the items are to be repaired or replaced):

- In lieu of repairs, Seller to credit Buyer $1,500.00 (One Thousand Five Hundred) at Closing.

- In addition to providing a one year home warranty (Line 373-375 in the P&S Agreement) by 2-10 Home Buyers Warranty for $540.00 (Five Hundred Forty), Seller to pay $1,080.00 (One Thousand Eighty) for the purchase of an additional two years of a limited home protection plan to be funded at Closing (totaling three years of a home protection plan). Plan Provider is 2-10 Home Buyers Warranty and will be ordered by Christianson Patterson Courtney & Associates.

Seller agrees to complete the above matters __0__ days prior to Closing (as provided in the Agreement "Completion of Repairs Deadline") at which time Buyer and/or Buyer's inspectors or representatives shall have the right to re-inspect to confirm that such matters have been completed. Such inspection shall not limit Buyer's right to conduct a Final Inspection as provided for in paragraph 9 of the Agreement.

It is agreed by the parties hereto that all of the other terms and conditions of the aforementioned Agreement shall remain in full force and effect other than as specifically modified herein.

The party(ies) below have signed and acknowledge receipt of a copy.

*Meridius Trust, P Hyde Bell, Trustee*
4/16/2018 12:31:32 PM CDT

BUYER                                                 BUYER

04/16/2018
_____ at _____ o'clock □ am/ □ pm          _____ at _____ o'clock □ am/ □ pm
Date                                                 Date

The party(ies) below have signed and acknowledge receipt of a copy.

*Stewart Campbell Junior*                            *Shanan L. Campbell*
4/16/2018 11:24:27 AM CDT                            4/16/2018 11:23:57 AM CDT

SELLER Stewart Campbell Junior                       SELLER Shanan L. Campbell
04/16/2018                                           04/16/2018
_____ at _____ o'clock □ am/ □ pm          _____ at _____ o'clock □ am/ □ pm
Date                                                 Date

NOTE: This form is provided by TAR to its members for their use in real estate transactions and is to be used as is. By downloading and/or using this form, you agree and covenant not to alter, amend, or edit said form or its contents except as where provided in the blank fields, and agree and acknowledge that any such alteration, amendment or edit of said form is done at your own risk. Use of the TAR logo in conjunction with any form other than standardized forms created by TAR is strictly prohibited. This form is subject to periodic revision and it is the responsibility of the member to use the most recent available form.

This form is copyrighted and may only be used in real estate transactions in which **Laura Clay**      is involved as a TAR authorized user.
Unauthorized use of the form may result in legal sanctions being brought against the user and should be reported to the Tennessee Association of Realtors® at (615) 321-1477.

> TENNESSEE       Copyright 2014 © Tennessee Realtors®                          Version 01/01/2018
REALTORS         RF655 – Repair / Replacement Amendment, Page 1 of 1

Instanet FORMS

**EXHIBIT 7**

American Land Title Association

ALTA Settlement Statement - Cash
Adopted 05-01-2015

**First Title and Escrow Company, Inc.**
**ALTA Universal ID**
**3811 Bedford Avenue, Suite 205**
**Nashville, TN  37215**

**File No./Escrow No.:** 34217-04-2018
**Print Date & Time:** April 18, 2018 at 12:02·PM
**Officer/Escrow Officer:** Gerald G. Patterson
**Settlement Location:** 3811 Bedford Ave., Suite 205
Nashville, TN 37215

**Property Address:** 219 Gloucester Street
Franklin, TN 37064

**Buyer:** Pamela Hyde Bell, Trustee of T
**Seller:** Stewart Campbell, Jr. and Shanan L. Campbell
**Lender:**
**Settlement Date:** April 18, 2018
**Disbursement Date:** April 18, 2018

EXHIBIT
P. Bell
6
2/5/26 JC
PENGAD 800-631-6989

| Seller | | Description | Buyer | |
|---|---|---|---|---|
| Debit | Credit | | Debit | Credit |
| | | **Financial** | | |
| | $ 437,000.00 | Sale Price of Property | $ 437,000.00 | |
| | | Deposit | | $ 10,000.00 |
| $ 1,500.00 | | Seller Credit | | $ 1,500.00 |
| | | **Prorations/Adjustments** | | |
| $ 95.28 | | City/Town Taxes 01/01/18 to 04/19/18 | | $ 95.28 |
| $ 613.68 | | County Taxes 01/01/18 to 04/19/18 | | $ 613.68 |
| | | **Loan Charges to** | | |
| | | **Other Loan Charges** | | |
| | | **Impounds** | | |
| | | **Title Charges & Escrow / Settlement Charges** | | |
| $ 1,734.80 | | Title - Owner's Title Insurance (optional) to First Title and Escrow Company, Inc. RIC $575.70 Coverage: $ 437,000.00 Premium: $ 1,734.80 | | |
| | | Title-E-Recording Fee to  to First Title FBO Simplifile  Register of Deeds | $ 5.00 | |

Copyright 2015 American Land Title Association
All rights reserved

(34217-04-2018.PFD/34217-04-2018/5)
Printed on 04/18/18 at 12:02·PM

| Seller | | | | Buyer | |
| Debit | Credit | | | Debit | Credit |
| | | Title-Settlement/Closing Fee | to First Title and Escrow Company, Inc. | $ 450.00 | |

**Commission**

| Seller | | | | Buyer | |
| Debit | Credit | | | Debit | Credit |
| $ 8,740.00 | | Commission | to Christianson, Patterson, Courtney and Associates | | |
| $ 13,110.00 | | Commission | to The Pilkerton Company | | |

**Government Recording and Transfer Charges**

| Seller | | | | Buyer | |
| Debit | Credit | | | Debit | Credit |
| | | Recording Fees | to Williamson County Register of Deeds | $ 18.00 | |
| | | Deed:$18.00 Mortgage:$0.00 | | | |
| | | Transfer Taxes Deed | to Williamson County Register of Deeds | $ 1,616.90 | |

**Payoffs**

| Seller | | | | Buyer | |
| Debit | Credit | | | Debit | Credit |
| $ 350.00 | | Attorney Fee Seller | to James T. Ogelsby | | |
| $ 195.00 | | Closing Fee | to Mid-State Title & Escrow, Inc. | | |

**Miscellaneous**

| Seller | | | | Buyer | |
| Debit | Credit | | | Debit | Credit |
| $ 1,620.00 | | Home Warranty | to Home Buyers Resale Warranty Corporation | | |

| Seller | | | | Buyer | |
| Debit | Credit | | | Debit | Credit |
| $ 27,958.76 | $ 437,000.00 | **Subtotals** | | $ 439,089.90 | $ 12,208.96 |
| | | **Balance Due FROM** | | | $ 426,880.94 |
| $ 409,041.24 | | **Balance Due TO** | | | |
| $ 437,000.00 | $ 437,000.00 | **TOTALS** | | $ 439,089.90 | $ 439,089.90 |

Copyright 2015 American Land Title Association
All rights reserved

(34217-04-2018.PFD/34217-04-2018/5)
Printed on 04/18/18 at 12:02·PM

Re:    219 Gloucester Street, Franklin, TN  37064

## Acknowledgement

We/I have carefully reviewed the ALTA Settlement Statement and find it to be a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction and further certify that I have received a copy of the ALTA Settlement Statement. We/I authorize First Title & Escrow Company, Inc. to cause the funds to be disbursed in accordance with this statement.

Executed this 18th day of April, 2018.

Purchaser(s):                                    Seller(s):

_____        _____
Pamela Hyde Bell, Trustee of The Meridus        Stewart Campbell, Jr.
Trust u/a dated April 6, 2018

                                                _____
                                                Shanan L. Campbell

Closing Agent:


_____

Re:    219 Gloucester Street, Franklin, TN  37064

## Acknowledgement

We/I have carefully reviewed the ALTA Settlement Statement and find it to be a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction and further certify that I have received a copy of the ALTA Settlement Statement. We/I authorize First Title & Escrow Company, Inc. to cause the funds to be disbursed in accordance with this statement.

Executed this 18th day of April, 2018.

Purchaser(s):                                    Seller(s):

_Pamela Hyde Bell, Trustee_                      _____

Pamela Hyde Bell, Trustee of The Meridus         Stewart Campbell, Jr.
Trust u/a dated April 6, 2018

                                                 _____

                                                 Shanan L. Campbell

Closing Agent:

_____

**EXHIBIT 8**

# Single Ledger Balance Report



EXHIBIT

P. Bell

5

2/5/26

## Selection Criteria

Trust Account: *PIN/ESCROW*
Trust Account Number: ▮9978
File ID: *34217-04-2018*
Responsible Party: *Ashley*
Settlement Date: *04/18/18*
Starting Date: *04/16/18*
Ending Date: *04/18/18*

Trust Account Description: ▮9978
Client / Matter: *Pamela Hyde Bell, Trustee of T*
Ledger Comment:
Property: *219 Gloucester Street/Franklin TN 37064*

| Ref/Ck Number | Trans. Date | Payee Name / Memo | Medium | Cleared Date | Amount |
|---|---|---|---|---|---|
| | | **Beginning Balance on 04/16/18:** | | | $0.00 |
| **Deposits** | | | | | |
| | 04/17/18 | Pam Bell / Real Estate Closing | | 04/30/18 | $426,880.94 |
| | 04/18/18 | Mid-State Title & Escrow, Inc. | | | $10,000.00 |
| | | **Total of 2 Deposits:** | | | $436,880.94 |
| **Checks** | | | | | |
| 48172 | 04/18/18 | Fidelity National Title Insurance Compar / Title Charges | Check | | $231.56 |
| 48173 | 04/18/18 | James T. Ogelsby / Attorney Fee Seller | Check | | $350.00 |
| 48174 | 04/18/18 | Mid-State Title & Escrow, Inc. / Closing Fee | Check | | $946.62 |
| 48175 | 04/18/18 | First Title and Escrow Company, Inc. / Settlement Agents Fees | Check | | $1,201.62 |
| 48176 | 04/18/18 | Home Buyers Resale Warranty Corpora / Home Warranty | Check | | $1,620.00 |
| 48177 | 04/18/18 | First Title FBO Williamson County Regis / Government Charges | Check | | $1,639.90 |
| 48178 | 04/18/18 | Christianson, Patterson, Courtney and A / Commission | Check | | $8,740.00 |
| 48179 | 04/18/18 | The Pilkerton Company / Commission | Check | | $13,110.00 |
| | | **Total of 8 Checks:** | | | $27,839.70 |
| **Void Checks** | | | | | |
| 48180 | 04/18/18 | Stewart Campbell, Jr. and Shanan L. Ca | Check | 04/18/18 | $409,041.24 |
| | | **Total of 1 Void Check:** | | | $409,041.24 |
| **Outgoing Wires** | | | | | |
| | 04/18/18 | Stewart Campbell, Jr. and Shanan L. Ca | | | $409,041.24 |
| | | **Total of 1 Outgoing Wire:** | | | $409,041.24 |

Case 3:26-ap-90047    Doc 1    Filed 05/07/26    Entered 05/07/26 16:33:41    Desc Main
Document      Page 149 of 151

# Single Ledger Balance Report

| | | **Ending Balance on 04/18/18:** | | | **$0.00** |

Case 3:26-ap-90047   Doc 1   Filed 05/07/26   Entered 05/07/26 16:33:41   Desc Main Document    Page 150 of 151



🖶 Print this page   ❶ Help

# Transfers

Transfer has been debited. Please see history for details.

## Transfer Details

|  |  |
|---|---|
| From: | Wire In Account Checking *6443 |
| To: | Escrow Account Checking *9978 |
| Transfer Description: | 34217 |
| Amount: | $426,880.94 |
| Frequency: | One-Time |
| Period: | Once |
| Scheduled Date: | 04/17/2018 |
| Transfer ID: | 196358469 |
| Submit Date/Time: | 4/17/2018 4:55:08 pm CDT |